## SHAUGHNESSY, DISTRICT DIRECTOR OF IMMIGRATION AND NATURALIZATION, v. UNITED STATES EX REL. MEZEI.

No. 139. Argued January 7–8, 1953.—Decided March 16, 1953.

*Ross L. Malone, Jr.* argued the cause for petitioner. With him on the brief were *Solicitor General Cummings, John F. Davis, L. Paul Winings* and *Maurice A. Roberts.*

*Jack Wasserman* argued the cause and filed a brief for respondent.

MR. JUSTICE CLARK delivered the opinion of the Court.

This case concerns an alien immigrant permanently excluded from the United States on security grounds but stranded in his temporary haven on Ellis Island because other countries will not take him back. The issue is whether the Attorney General's continued exclusion of respondent without a hearing amounts to an unlawful detention, so that courts may admit him temporarily to the United States on bond until arrangements are made for his departure abroad. After a hearing on respondent's petition for a writ of habeas corpus, the District Court so held and authorized his temporary admission on $5,000 bond.[1] The Court of Appeals affirmed that action, but directed reconsideration of the terms of the

[1] 101 F. Supp. 66 (1951).

parole.[2]   Accordingly, the District Court entered a modified order reducing bond to $3,000 and permitting respondent to travel and reside in Buffalo, New York. Bond was posted and respondent released.   Because of resultant serious problems in the enforcement of the immigration laws, we granted certiorari.   344 U. S. 809.

Respondent's present dilemma springs from these circumstances: Though, as the District Court observed, "[t]here is a certain vagueness about [his] history," respondent seemingly was born in Gibraltar of Hungarian or Rumanian parents and lived in the United States from 1923 to 1948.[3]   In May of that year he sailed for Europe, apparently to visit his dying mother in Rumania.   Denied entry there, he remained in Hungary for some 19 months, due to "difficulty in securing an exit permit."   Finally, armed with a quota immigration visa issued by the American Consul in Budapest, he proceeded to France and boarded the *Ile de France* in Le Havre bound for New York.   Upon arrival on February 9, 1950, he was temporarily excluded from the United States by an immigration inspector acting pursuant to the Passport Act as amended and regulations thereunder.   Pending disposition of his case he was received at Ellis Island.   After reviewing the evidence, the Attorney General on May 10, 1950, ordered the temporary exclusion to be made permanent without a hearing before a board of special inquiry, on the "basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest."   That determination rested on a finding that respondent's entry would be prejudicial to the public interest for security reasons.   But thus far all attempts to effect respondent's departure have failed: Twice he shipped

---

[2] 195 F. 2d 964 (C. A. 2d Cir. 1952).
[3] 101 F. Supp., at 67.

out to return whence he came; France and Great Britain refused him permission to land. The State Department has unsuccessfully negotiated with Hungary for his readmission. Respondent personally applied for entry to about a dozen Latin-American countries but all turned him down. So in June 1951 respondent advised the Immigration and Naturalization Service that he would exert no further efforts to depart. In short, respondent sat on Ellis Island because this country shut him out and others were unwilling to take him in.

Asserting unlawful confinement on Ellis Island, he sought relief through a series of habeas corpus proceedings. After four unsuccessful efforts on respondent's part, the United States District Court for the Southern District of New York on November 9, 1951, sustained the writ. The District Judge, vexed by the problem of "an alien who has no place to go," did not question the validity of the exclusion order but deemed further "detention" after 21 months excessive and justifiable only by affirmative proof of respondent's danger to the public safety. When the Government declined to divulge such evidence, even *in camera,* the District Court directed respondent's conditional parole on bond.[4] By a divided vote, the Court of Appeals affirmed. Postulating that the power to hold could never be broader than the power to remove or shut out and that to "continue an alien's confinement beyond that moment when deportation becomes patently impossible is to deprive him of his liberty," the court found respondent's "confinement" no longer justifiable as a means of removal elsewhere, thus not authorized by statute, and in violation of due process.[5] Judge Learned Hand, dissenting, took a different view: The Attorney General's order was one of "exclu-

---

[4] 101 F. Supp., at 67, 70; R. 26–27.

[5] 195 F. 2d, at 967, 968.

sion" and not "deportation"; respondent's transfer from ship to shore on Ellis Island conferred no additional rights; in fact, no alien so situated "can force us to admit him at all." [6]

Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control. *The Chinese Exclusion Case,* 130 U. S. 581 (1889); *Fong Yue Ting* v. *United States,* 149 U. S. 698 (1893); *Knauff* v. *Shaughnessy,* 338 U. S. 537 (1950); *Harisiades* v. *Shaughnessy,* 342 U. S. 580 (1952). In the exercise of these powers, Congress expressly authorized the President to impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife. That authorization, originally enacted in the Passport Act of 1918, continues in effect during the present emergency. Under it, the Attorney General, acting for the President, may shut out aliens whose "entry would be prejudicial to the interests of the United States." [7] And he may exclude without a hearing when the exclusion is based on confidential information the

---

[6] *Id.,* at 970.

[7] Section 1 of the Act of May 22, 1918, c. 81, 40 Stat. 559, as amended by the Act of June 21, 1941, c. 210, § 1, 55 Stat. 252, 22 U. S. C. § 223, provides in pertinent part:

"When the United States is at war or during the existence of the national emergency proclaimed by the President on May 27, 1941, or as to aliens whenever there exists a state of war between, or among, two or more states, and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful—

"(a) For any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules,

disclosure of which may be prejudicial to the public interest.[8] The Attorney General in this case proceeded in accord with these provisions; he made the necessary determinations and barred the alien from entering the United States.

regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe; . . . ."

That authorization has been extended to cover the dates relevant in this case. 66 Stat. 54, 96, 137, 330. Pursuant to that authority, Presidential Proclamation No. 2523, 6 Fed. Reg. 5821, as promulgated in 1941 in part provided:

"No alien shall be permitted to enter the United States if it appears to the satisfaction of the Secretary of State that such entry would be prejudicial to the interests of the United States as provided in the rules and regulations hereinbefore authorized to be prescribed by the Secretary of State, with the concurrence of the Attorney General."

The Secretary of State, with the concurrence of the Attorney General, issued applicable regulations codified as Part 175 of 8 CFR. Section 175.53 defines eleven categories of aliens whose entry is "deemed to be prejudicial to the interests of the United States." That delegation of authority has been upheld. *Knauff* v. *Shaughnessy,* 338 U. S. 537 (1950). The regulations were ratified and confirmed by Presidential Proclamation No. 2850, 14 Fed. Reg. 5173, promulgated August 17, 1949.

[8] 8 CFR § 175.57 provides:

"§ 175.57 *Entry not permitted in special cases.* (a) Any alien, even though in possession of a permit to enter, or exempted under §§175.41 to 175.62, inclusive, from obtaining a permit to enter, may be excluded temporarily if at the time he applies for admission at a port of entry it appears that he is or may be excludable under one of the categories set forth in § 175.53. The official excluding the alien shall immediately report the facts to the head of his department, who will communicate such report to the Secretary of State. Any alien so temporarily excluded by an official of the Department of Justice shall not be admitted and shall be excluded and deported unless the Attorney General, after consultation with the Secretary of State, is satisfied that the admission of the alien would not be prejudicial to the interests of the United States. Any alien so temporarily excluded by any other official shall not be admitted and shall be excluded and deported unless the Secretary of State is satisfied that

It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. *The Japanese Immigrant Case,* 189 U. S. 86, 100–101 (1903); *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 49–50 (1950); *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 598 (1953). But an alien on the threshold of initial entry stands on a different footing: "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff* v. *Shaughnessy, supra,* at 544; *Ekiu* v. *United States,* 142 U. S. 651, 660 (1892). And because the action of the executive officer under such authority is final and conclusive, the Attorney General cannot be compelled to disclose the evidence underlying his determinations in an exclusion case; "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government." *Knauff* v. *Shaughnessy, supra,* at 543; *Ekiu* v. *United States, supra,* at 660. In a case such as this, courts cannot retry the determination of the Attorney General. *Knauff* v. *Shaughnessy, supra,* at 546; *Ludecke* v. *Watkins,* 335 U. S. 160, 171–172 (1948).

---

the admission of the alien would not be prejudicial to the interests of the United States.

"(b) In the case of an alien temporarily excluded by an official of the Department of Justice on the ground that he is, or may be excludable under one or more of the categories set forth in § 175.53, no hearing by a board of special inquiry shall be held until after the case is reported to the Attorney General and such a hearing is directed by the Attorney General or his representative. In any special case the alien may be denied a hearing before a board of special inquiry and an appeal from the decision of that board if the Attorney General determines that he is excludable under one of the categories set forth in § 175.53 on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest."

Neither respondent's harborage on Ellis Island nor his prior residence here transforms this into something other than an exclusion proceeding. Concededly, his movements are restrained by authority of the United States, and he may by habeas corpus test the validity of his exclusion. But that is true whether he enjoys temporary refuge on land, *Ekiu* v. *United States, supra,* or remains continuously aboard ship. *United States* v. *Jung Ah Lung,* 124 U. S. 621, 626 (1888); *Chin Yow* v. *United States,* 208 U. S. 8, 12 (1908). In sum, harborage at Ellis Island is not an entry into the United States. *Kaplan* v. *Tod,* 267 U. S. 228, 230 (1925); *United States* v. *Ju Toy,* 198 U. S. 253, 263 (1905); *Ekiu* v. *United States, supra,* at 661. For purposes of the immigration laws, moreover, the legal incidents of an alien's entry remain unaltered whether he has been here once before or not. He is an entering alien just the same, and may be excluded if unqualified for admission under existing immigration laws. *E. g., Lem Moon Sing* v. *United States,* 158 U. S. 538, 547–548 (1895); *Polymeris* v. *Trudell,* 284 U. S. 279 (1932).

To be sure, a lawful resident alien may not captiously be deprived of his constitutional rights to procedural due process. *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 601 (1953); cf. *Delgadillo* v. *Carmichael,* 332 U. S. 388 (1947). Only the other day we held that under some circumstances temporary absence from our shores cannot constitutionally deprive a returning lawfully resident alien of his right to be heard. *Kwong Hai Chew* v. *Colding, supra.* Chew, an alien seaman admitted by an Act of Congress to permanent residence in the United States, signed articles of maritime employment as chief steward on a vessel of American registry with home port in New York City. Though cleared by the Coast Guard for his voyage, on his return from four months at sea he was "excluded" without a hearing on security grounds.

On the facts of that case, including reference to § 307 (d) (2) of the Nationality Act of 1940, we felt justified in "assimilating" his status for constitutional purposes to that of continuously present alien residents entitled to hearings at least before an executive or administrative tribunal. *Id.,* at 596, 599–601. Accordingly, to escape constitutional conflict we held the administrative regulations authorizing exclusion without hearing in certain security cases inapplicable to aliens so protected by the Fifth Amendment. *Id.,* at 600.

But respondent's history here drastically differs from that disclosed in Chew's case. Unlike Chew who with full security clearance and documentation pursued his vocation for four months aboard an American ship, respondent, apparently without authorization or reentry papers,[9] simply left the United States and remained behind the Iron Curtain for 19 months. Moreover, while § 307 of the 1940 Nationality Act regards maritime service such as Chew's to be continuous residence for naturalization purposes, that section deems protracted absence such as respondent's a clear break in an alien's continuous residence here.[10] In such circumstances, we have no difficulty in holding respondent an entrant alien or "assimilated to [that] status" for constitutional purposes. *Id.,* at 599. That being so, the Attorney General may lawfully exclude respondent without a hearing as authorized

---

[9] See 8 U. S. C. § 210. Of course, neither a reentry permit, issuable upon proof of prior lawful admission to the United States, § 210 (b), nor an immigration visa entitles an otherwise inadmissible alien to entry. §§ 210 (f), 202 (g). An immigrant is not unaware of this; § 202 (g) directs those facts to be "printed conspicuously upon every immigration visa." For a recent study of entry procedures with recommendations, see Report of the President's Commission on Immigration and Naturalization (1953), cc. 10–11.

[10] 8 U. S. C. § 707; *United States* v. *Larsen,* 165 F. 2d 433 (C. A. 2d Cir. 1947).

by the emergency regulations promulgated pursuant to the Passport Act. Nor need he disclose the evidence upon which that determination rests. *Knauff* v. *Shaughnessy,* 338 U. S. 537 (1950).

There remains the issue of respondent's continued exclusion on Ellis Island. Aliens seeking entry from contiguous lands obviously can be turned back at the border without more. *Polymeris* v. *Trudell,* 284 U. S. 279 (1932). While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility, resulting hardships to the alien and inconvenience to the carrier persuaded Congress to adopt a more generous course. By statute it authorized, in cases such as this, aliens' temporary removal from ship to shore.[11] But such temporary harborage, an act of legislative grace, bestows no additional rights. Congress meticulously specified that such shelter ashore "shall not be considered a landing" nor relieve the vessel of the duty to transport back the alien if ultimately excluded.[12] And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border. *Ekiu* v. *United States,* 142 U. S. 651, 661–662 (1892); *United States* v. *Ju Toy,* 198 U. S. 253, 263 (1905); *Kaplan* v. *Tod,* 267 U. S. 228, 230 (1925).

Thus we do not think that respondent's continued exclusion deprives him of any statutory or constitutional right. It is true that resident aliens temporarily detained pending expeditious consummation of deportation proceedings may be released on bond by the Attorney General whose discretion is subject to judicial review. *Carlson* v. *Landon,* 342 U. S. 524 (1952). By that procedure aliens uprooted from our midst may rejoin the

[11] 8 U. S. C. § 151.
[12] 8 U. S. C. §§ 151, 154.

community until the Government effects their leave.[13]
An exclusion proceeding grounded on danger to the
national security, however, presents different consider-
ations; neither the rationale nor the statutory au-
thority for such release exists.[14] Ordinarily to admit an
alien barred from entry on security grounds nullifies the
very purpose of the exclusion proceeding; Congress in
1950 declined to include such authority in the statute.[15]
That exclusion by the United States plus other nations'
inhospitality results in present hardship cannot be ig-
nored. But, the times being what they are, Congress may
well have felt that other countries ought not shift the
onus to us; that an alien in respondent's position is no
more ours than theirs. Whatever our individual estimate
of that policy and the fears on which it rests, respond-
ent's right to enter the United States depends on the
congressional will, and courts cannot substitute their judg-
ment for the legislative mandate. *Harisiades* v. *Shaugh-
nessy*, 342 U. S. 580, 590–591 (1952).

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS
concurs, dissenting.

Mezei came to this country in 1923 and lived as a resi-
dent alien in Buffalo, New York, for twenty-five years.

----

[13] 8 U. S. C. (Supp. V) § 156. We there noted that "the problem
of habeas corpus after unusual delay in *deportation hearings* is not
involved in this case." 342 U. S., at 546. (Emphasis added.)

[14] 8 U. S. C. § 154 permits temporary suspension of deportation of
excluded aliens whose testimony is needed on behalf of the United
States. Manifestly respondent does not fall within that class. While
the essence of that provision is retained in § 237 (d) of the Immigra-
tion and Nationality Act of 1952, 66 Stat. 202, § 212 (d)(5) of that
Act, 66 Stat. 188, vests new and broader discretion in the Attorney
General. Cf. 8 U. S. C. §§ 136 (p)(q); 8 U. S. C. (Supp. V)
§ 137–5 (a)(b). Those provisions are not now here.

[15] See S. Rep. No. 1515, 81st Cong., 2d Sess. 643–644.

He made a trip to Europe in 1948 and was stopped at our shore on his return in 1950. Without charge of or conviction for any crime, he was for two years held a prisoner on Ellis Island by order of the Attorney General. Mezei sought habeas corpus in the District Court. He wanted to go to his wife and home in Buffalo. The Attorney General defended the imprisonment by alleging that it would be dangerous to the Nation's security to let Mezei go home even temporarily on bail. Asked for proof of this, the Attorney General answered the judge that all his information was "of a confidential nature" so much so that telling any of it or even telling the names of any of his secret informers would jeopardize the safety of the Nation. Finding that Mezei's life as a resident alien in Buffalo had been "unexceptionable" and that no facts had been proven to justify his continued imprisonment, the District Court granted bail. The Court of Appeals approved. Now this Court orders Mezei to leave his home and go back to his island prison to stay indefinitely, maybe for life.

MR. JUSTICE JACKSON forcefully points out the danger in the Court's holding that Mezei's liberty is completely at the mercy of the unreviewable discretion of the Attorney General. I join MR. JUSTICE JACKSON in the belief that Mezei's continued imprisonment without a hearing violates due process of law.

No society is free where government makes one person's liberty depend upon the arbitrary will of another. Dictatorships have done this since time immemorial. They do now. Russian laws of 1934 authorized the People's Commissariat to imprison, banish and exile Russian citizens as well as "foreign subjects who are socially dangerous."* Hitler's secret police were

---

*Decree of the Central Executive Committee and Council of People's Commissars, U. S. S. R., 5 Nov. 1934; Collection of Laws, U. S. S. R., 1935, No. 11, Art. 84. Hazard, Materials on Soviet Law

given like powers. German courts were forbidden to make any inquiry whatever as to the information on which the police acted. Our Bill of Rights was written to prevent such oppressive practices. Under it this Nation has fostered and protected individual freedom. The Founders abhorred arbitrary one-man imprisonments. Their belief was—our constitutional principles are—that no person of any faith, rich or poor, high or low, native or foreigner, white or colored, can have his life, liberty or property taken "without due process of law." This means to me that neither the federal police nor federal prosecutors nor any other governmental official, whatever his title, can put or keep people in prison without accountability to courts of justice. It means that individual liberty is too highly prized in this country to allow executive officials to imprison and hold people on the basis of information kept secret from courts. It means that Mezei should not be deprived of his liberty indefinitely except as the result of a fair open court hearing in which evidence is appraised by the court, not by the prosecutor.

MR. JUSTICE JACKSON, whom MR. JUSTICE FRANKFURTER joins, dissenting.

Fortunately it still is startling, in this country, to find a person held indefinitely in executive custody without accusation of crime or judicial trial. Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land. The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive re-

(1947), 16. See Hazard, Reforming Soviet Criminal Law, 29 J. Crim. L. & Criminology 157, 168–169 (1938–1939). See also Berman, Principles of Soviet Criminal Law, 56 Yale L. J. 803 (1946).

straint. Under the best tradition of Anglo-American law, courts will not deny hearing to an unconvicted prisoner just because he is an alien whose keep, in legal theory, is just outside our gates. Lord Mansfield, in the celebrated case holding that slavery was unknown to the common law of England, ran his writ of habeas corpus in favor of an alien, an African Negro slave, and against the master of a ship at anchor in the Thames.[1]

## I.

What is our case?[2] In contemplation of law, I agree, it is that of an alien who asks admission to the country. Concretely, however, it is that of a lawful and law-abiding inhabitant of our country for a quarter of a century, long ago admitted for permanent residence, who seeks to return home. After a foreign visit to his aged and ailing mother that was prolonged by disturbed conditions of Eastern Europe, he obtained a visa for admission issued by our consul and returned to New York. There the Attorney General refused to honor his documents and turned him back as a menace to this Nation's security. This man, who seems to have led a life of unrelieved insignificance, must have been astonished to find himself suddenly putting the Government of the United States in such fear that it was afraid to tell him why it was afraid of him. He was shipped and reshipped to France, which twice refused him landing. Great Britain declined, and no other European country has been found willing to open its doors to him. Twelve countries

---

[1] Sommersett's Case, 20 How. St. Tr. 1; 2 Campbell, Lives of The Chief Justices, 418; Fiddes, Lord Mansfield and The Sommersett Case, 50 L. Q. Rev. 499.

[2] I recite facts alleged in the petition for the writ. Since the Government declined to try the case on the merits, I think we must consider the question on well-pleaded allegations of the petition. Petitioner might fail to make good on a hearing; the question is, must he fail without one?

of the American Hemisphere refused his applications. Since we proclaimed him a Samson who might pull down the pillars of our temple, we should not be surprised if peoples less prosperous, less strongly established and less stable feared to take him off our timorous hands. With something of a record as an unwanted man, neither his efforts nor those of the United States Government any longer promise to find him an abiding place. For nearly two years he was held in custody of the immigration authorities of the United States at Ellis Island, and if the Government has its way he seems likely to be detained indefinitely, perhaps for life, for a cause known only to the Attorney General.

Is respondent deprived of liberty? The Government answers that he was "transferred to Ellis Island on August 1, 1950, for safekeeping," and "is not being detained in the usual sense but is in custody solely to prevent him from gaining entry to the United States in violation of law. He is free to depart from the United States to any country of his own choice." Government counsel ingeniously argued that Ellis Island is his "refuge" whence he is free to take leave in any direction except west. That might mean freedom, if only he were an amphibian! Realistically, this man is incarcerated by a combination of forces which keep him as effectually as a prison, the dominant and proximate of these forces being the United States immigration authority. It overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound. Despite the impeccable legal logic of the Government's argument on this point, it leads to an artificial and unreal conclusion.[3] We must

---

[3] Mr. Justice Holmes, for the Court, said in *Chin Yow* v. *United States*, 208 U. S. 8, 12–13:

"If we regard the petitioner, as in *Ju Toy's case* it was said that he should be regarded, as if he had been stopped and kept at the limit of our jurisdiction, 198 U. S. 263, still it would be difficult to say that

regard this alien as deprived of liberty, and the question is whether the deprivation is a denial of due process of law.

The Government on this point argues that "no alien has any constitutional right to entry into the United States"; that "the alien has only such rights as Congress sees fit to grant in exclusion proceedings"; that "the so-called detention is still merely a continuation of the exclusion which is specifically authorized by Congress"; that since "the restraint is not incidental to an order [of exclusion] but is, itself, the effectuation of the exclusion order, there is no limit to its continuance" other than statutory, which means no limit at all. The Government all but adopts the words of one of the officials responsible for the administration of this Act who testified before a congressional committee as to an alien applicant, that "He has no rights." [4]

---

he was not imprisoned, theoretically as well as practically, when to turn him back meant that he must get into a vessel against his wish and be carried to China. The case would not be that of a person simply prevented from going in one direction that he desired and had a right to take, all others being left open to him, a case in which the judges were not unanimous in *Bird* v. *Jones,* 7 Q. B. 742. But we need not speculate upon niceties. It is true that the petitioner gains no additional right of entrance by being allowed to pass the frontier in custody for the determination of his case. But on the question whether he is wrongly imprisoned we must look at the actual facts. *De facto* he is locked up until carried out of the country against his will."

[4] Testimony of Almanza Tripp, an immigration service official, before the Senate Subcommittee on Immigration on February 15, 1950, included the following:

"Now, when we have a case of that sort, where central registry contains something derogatory of that nature, I do not believe we should make a finding of admissibility until it has been disproved. But the evidence that they had in central registry would not be sufficient for our Service to exclude by the normal board of special-inquiry proceedings, because those proceedings must be conducted in

The interpretations of the Fifth Amendment's command that no person shall be deprived of life, liberty or property without due process of law, come about to this: reasonable general legislation reasonably applied to the individual. The question is whether the Government's detention of respondent is compatible with these tests of substance and procedure.

## II. SUBSTANTIVE DUE PROCESS.

Substantively, due process of law renders what is due to a strong state as well as to a free individual. It tolerates all reasonable measures to insure the national safety, and it leaves a large, at times a potentially dangerous, latitude for executive judgment as to policies and means.[5]

After all, the pillars which support our liberties are the three branches of government, and the burden could not be carried by our own power alone. Substantive due process will always pay a high degree of deference to congressional and executive judgment, especially when they concur, as to what is reasonable policy under conditions of particular times and circumstances. Close to the maximum of respect is due from the judiciary to the political departments in policies affecting security and alien exclusion. *Harisiades* v. *Shaughnessy,* 342 U. S. 580.

Due process does not invest any alien with a right to enter the United States, nor confer on those admitted

---

a manner in which they could not be subject to attack in a court of the United States.

"You may say that it is unfair to the applicant not to give him that protection, but you must remember that the applicant is an applicant. He has no rights. . . ." (Hearings before the Subcommittee on Amendments to the Displaced Persons Act, Senate Committee on the Judiciary, 81st Cong., 1st and 2d Sessions 665.)

[5] Cf. *Korematsu* v. *United States,* 323 U. S. 214.

the right to remain against the national will. Nothing in the Constitution requires admission or sufferance of aliens hostile to our scheme of government.

Nor do I doubt that due process of law will tolerate some impounding of an alien where it is deemed essential to the safety of the state. Even the resident, friendly alien may be subject to executive detention without bail, for a reasonable period, pending consummation of deportation arrangements. *Carlson* v. *Landon,* 342 U. S. 524. The alien enemy may be confined or his property seized and administered because hostility is assumed from his continued allegiance to a hostile state. Cf. *Ludecke* v. *Watkins,* 335 U. S. 160; *Zittman* v. *McGrath,* 341 U. S. 446, and 341 U. S. 471.

If due process will permit confinement of resident aliens friendly in fact because of imputed hostility, I should suppose one personally at war with our institutions might be confined, even though his state is not at war with us. In both cases, the underlying consideration is the power of our system of government to defend itself, and changing strategy of attack by infiltration may be met with changed tactics of defense.

Nor do I think the concept of due process so paralyzing that it forbids all detention of an alien as a preventive measure against threatened dangers and makes confinement lawful only after the injuries have been suffered. In some circumstances, even the citizen in default of bail has long been subject to federal imprisonment for security of the peace and good behavior.[6] While it is usually applied for express verbal threats, no reason is known to me why the power is not the same in the case of threats inferred by proper procedures from circumstances. The British, with whom due process is a habit, if not a written

---

[6] 18 U. S. C. § 3043; cf. Criminal Code of New York, 66 McKinney's Consolidated Laws, Tit. II, c. II, § 84.

constitutional dictum, permit a court in a limited class of cases to pass a "sentence of preventive detention" if satisfied that it is expedient for the protection of the public.[7]

I conclude that detention of an alien would not be inconsistent with substantive due process, provided—and this is where my dissent begins—he is accorded procedural due process of law.

### III. PROCEDURAL DUE PROCESS.

Procedural fairness, if not all that originally was meant by due process of law, is at least what it most uncompromisingly requires. Procedural due process is more elemental and less flexible than substantive due process. It yields less to the times, varies less with conditions, and defers much less to legislative judgment. Insofar as it is technical law, it must be a specialized responsibility within the competence of the judiciary on which they do not bend before political branches of the Government, as they should on matters of policy which comprise substantive law.

If it be conceded that in some way this alien could be confined, does it matter what the procedure is? Only the untaught layman or the charlatan lawyer can answer that procedures matter not. Procedural fairness and regularity are of the indispensable essence of liberty. Severe substantive laws can be endured if they are fairly and impartially applied. Indeed, if put to the choice, one might well prefer to live under Soviet substantive law applied in good faith by our common-law procedures than under our substantive law enforced by Soviet procedural practices. Let it not be overlooked that due process of law is not for the sole benefit of an accused. It is the best insurance for the Government itself against those

---

[7] Criminal Justice Act, 1948, § 21 (2).

blunders which leave lasting stains on a system of justice but which are bound to occur on *ex parte* consideration. Cf. *Knauff* v. *Shaughnessy,* 338 U. S. 537, which was a near miss, saved by further administrative and congressional hearings from perpetrating an injustice. See Knauff, *The Ellen Knauff Story* (New York 1952).

Our law may, and rightly does, place more restrictions on the alien than on the citizen. But basic fairness in hearing procedures does not vary with the status of the accused. If the procedures used to judge this alien are fair and just, no good reason can be given why they should not be extended to simplify the condemnation of citizens. If they would be unfair to citizens, we cannot defend the fairness of them when applied to the more helpless and handicapped alien. This is at the root of our holdings that the resident alien must be given a fair hearing to test an official claim that he is one of a deportable class. *Wong Yang Sung* v. *McGrath,* 339 U. S. 33.

The most scrupulous observance of due process, including the right to know a charge, to be confronted with the accuser, to cross-examine informers and to produce evidence in one's behalf, is especially necessary where the occasion of detention is fear of future misconduct, rather than crimes committed. Both the old proceeding by which one may be bound to keep the peace and the newer British "preventive detention" are safeguarded with full rights to judicial hearings for the accused. On the contrary, the Nazi regime in Germany installed a system of "protective custody" by which the arrested could claim no judicial or other hearing process,[8] and as a result the con-

---

[8] Hermann Göring, on cross-examination, made the following statements:

". . . [T]hose who had committed some act of treason against the new state, or those who might be proved to have committed such an act, were naturally turned over to the courts. The others, however, of whom one might expect such acts, but who had not yet committed

226

centration camps were populated with victims of summary executive detention for secret reasons. That is what renders Communist justice such a travesty. There are other differences, to be sure, between authoritarian procedure and common law, but differences in the process of administration make all the difference between a reign of terror and one of law. Quite unconsciously, I am sure, the Government's theory of custody for "safekeeping" without disclosure to the victim of charges, evidence, informers or reasons, even in an administrative proceeding, has unmistakable overtones of the "protective custody" of the Nazis more than of any detaining procedure known to the common law. Such a practice, once established with the best of intentions, will drift into oppression of the disadvantaged in this country as surely as it has elsewhere. That these apprehensive surmises are not "such stuff as dreams are made on" appears from testimony of a top immigration official concerning an applicant that "He has no rights."

Because the respondent has no right of entry, does it follow that he has no rights at all? Does the power to exclude mean that exclusion may be continued or effectuated by any means which happen to seem appropriate to the authorities? It would effectuate his exclusion to eject him bodily into the sea or to set him adrift in a rowboat.

---

them, were taken into protective custody, and these were the people who were taken to concentration camps. . . . Likewise, if for political reasons . . . someone was taken into protective custody, that is, purely for reasons of state, this could not be reviewed or stopped by any court." He claimed (though the claim seemed specious) that twenty-four hours after being put in concentration camps they were informed of the reasons and after forty-eight hours were allowed an attorney. "But this by no means rescinded my order that a review was not permitted by the courts of a politically necessary measure of protective custody. These people were simply to be given an opportunity of making a protest." 9 International Military Tribunal Proceedings 420–421 (March 18, 1946).

Would not such measures be condemned judicially as a deprivation of life without due process of law? Suppose the authorities decide to disable an alien from entry by confiscating his valuables and money. Would we not hold this a taking of property without due process of law? Here we have a case that lies between the taking of life and the taking of property; it is the taking of liberty. It seems to me that this, occurring within the United States or its territorial waters, may be done only by proceedings which meet the test of due process of law.

Exclusion of an alien without judicial hearing, of course, does not deny due process when it can be accomplished merely by turning him back on land or returning him by sea. But when indefinite confinement becomes the means of enforcing exclusion, it seems to me that due process requires that the alien be informed of its grounds and have a fair chance to overcome them. This is the more due him when he is entrapped into leaving the other shore by reliance on a visa which the Attorney General refuses to honor.

It is evident that confinement of respondent no longer can be justified as a step in the process of turning him back to the country whence he came. Confinement is no longer ancillary to exclusion; it can now be justified only as the alternative to normal exclusion. It is an end in itself.

The Communist conspiratorial technique of infiltration poses a problem which sorely tempts the Government to resort to confinement of suspects on secret information secretly judged. I have not been one to discount the Communist evil. But my apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else.

Congress has ample power to determine whom we will admit to our shores and by what means it will effectuate its exclusion policy. The only limitation is that it may not do so by authorizing United States officers to take without due process of law the life, the liberty or the property of an alien who has come within our jurisdiction; and that means he must meet a fair hearing with fair notice of the charges.[9]

It is inconceivable to me that this measure of simple justice and fair dealing would menace the security of this country. No one can make me believe that we are that far gone.

---

[9] The trial court sought to reconcile due process for the individual with claims of security by suggesting that the Attorney General disclose *in camera* enough to enable a judicial determination of the legality of the confinement. The Attorney General refused. I do not know just how an *in camera* proceeding would be handled in this kind of case. If respondent, with or without counsel, were present, disclosures to them might well result in disclosures by them. If they are not allowed to be present, it is hard to see how it would answer the purpose of testing the Government's case by cross-examination or counter-evidence, which is what a hearing is for. The questions raised by the proposal need not be discussed since they do not call for decision here.