Humberto HERRERO–RODRIGUEZ, Petitioner,

v.

Nancy BAILEY, Warden, Respondent.

Civil No. 01–4472 (JBS).

United States District Court, D. New Jersey.

Dec. 18, 2002.

**544**

Humberto Herrero–Rodriguez, Fort Dix, NJ, Pro se.

Christopher Christie, United States Attorney by John Andrew Ruymann, Assistant U.S. Attorney, Trenton, NJ, for Respondent.

### *OPINION*

SIMANDLE, District Judge.

This matter is before the Court upon petitioner Humberto Herrero–Rodriguez's application for habeas corpus relief pursuant to 28 U.S.C. § 2241. Petitioner, a Mariel Cuban, is an alien who has been detained by the Immigration and Naturalization Service ("INS") since April 20, 1998. Petitioner is seeking habeas corpus relief on the basis of the recent United States Supreme Court case of *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), arguing that the *Zadvydas* decision should be extended to inadmissible aliens and that petitioner should be released from INS custody since his post-removal detention has been in excess of the presumptively reasonable six-month period set forth by the Supreme Court. Specifically, Petitioner contends, without elaboration or documentary support, that his detention pursuant to 8 U.S.C. § 1231(a)(6)[1] is violative of his constitu-

---

1. 8 U.S.C. § 1231(a)(6) provides:

Inadmissible or criminal aliens. An alien

tional rights under the Fifth, Sixth, and Fourteenth Amendments.

## BACKGROUND

Petitioner is one of nearly 125,000 Cuban natives who arrived in the United States in 1980 as part of the "Mariel Boat Lift," and, accordingly, occupies the status of inadmissible alien pursuant to sections 1225 and 1182 of Title 8 to the United States Code. When Petitioner reached the United States in 1980, he was detained for an exclusion hearing and was charged with being excludable under sections 212(a)(9) and (20) of the Immigration and Nationality Act (the "Act"), 8 U.S.C. §§ 1182(a)(9) and (20). Resp't's Br. at 1. Prior to Petitioner's exclusion hearing, he admitted to having been arrested and convicted in Cuba in 1964 for assault with a deadly weapon upon a police officer and that he had received a prison sentence of thirty years. *Id.* at 2; *Exclusion Appeal Proceedings, Ex. A.* He later recanted that admission, stating that he had been serving a fifteen-year sentence for stealing at the time of the Mariel Boat Lift. Resp't's Br. at 2; *Cuban Review Summary Sheet, Ex. 10.* On July 21, 1980, Petitioner was ordered excluded and deported from the United States, pursuant to section 212(a)(20) of the Act, as an immigrant not in possession of a valid entry document. Resp't's Br. at 1–2.

Subsequent to the Final Order of exclusion dated October 23, 1980, Petitioner was paroled into the United States; however, his parole was revoked [2] following a string of criminal offenses, including: narcotics violations (8/1/86, 3/9/87, 10/3/88, 9/12/90); possessing and carrying a concealed weapon (3/9/87, 8/1/87); attempted burglary of an unoccupied structure (9/12/90); grand larceny (9/12/90); battery of a law enforcement officer (5/11/94); resisting arrest with violence (5/11/94); and, depriving a law enforcement officer of means of protection (5/11/94). Resp't's Br., *Final Notice of Parole Denial, Ex. 6;* Resp't's Br., *Cuban Review Summary Sheet, Ex. 7;* Resp't's Br., *Final Notice of Parole Denial, Ex. 9;* Resp't's Br., *Cuban Review Summary Sheet, Ex. 10.*

The Cuban Review Panel has reviewed Petitioner's detention, pursuant to 8 C.F.R. § 212.12, on three separate occasions since Petitioner's return to INS custody on April 20, 1998. On each occasion, the Panel decided to deny Petitioner release after determining that it was not evident that Petitioner was presently non-violent, would remain non-violent, was unlikely to pose a threat to the community if released, or was unlikely to violate conditions of his parole.

Petitioner's first Panel review occurred on January 26, 1999, during which the

---

ordered removed who is inadmissible under section 212 [8 USCS § 1182], removable under section 237(a)(1)(C), 237(a)(2), or 237(a)(4) [8 USCS § 1227(a)(1)(C), (a)(2), or (a)(4)] or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

2. The record does not include paperwork indicating when Petitioner's parole was revoked; yet, the three Cuban Review Summary Sheets provided show that he has been de-

tained in INS custody since April 20, 1998. The Cuban Review Summary Sheet of January 26, 1999, suggests that Petitioner's parole was revoked on a prior occasion and that a previous Panel released him into the community, whereupon he committed an assault on a law enforcement officer. Thus, the record is not clear as to the circumstances surrounding Petitioner's most recent revocation of parole. However, the Court surmises that Petitioner's parole was revoked on account of his criminal behavior on May 11, 1994, which included battery of a law enforcement officer, resisting arrest with violence, and depriving a law enforcement officer of means of protection.

Panel considered the criminal activities Petitioner engaged in while in Cuba as well as the United States, his institutional record since his incarceration, and his discussion during an interview. Resp't's Br., *Cuban Review Summary Sheet, Ex. 10.* Reasons provided by the Panel as the basis upon which to deny release included Petitioner's criminal history, his non-credible responses to questions posed during his interview, and offenses he committed while incarcerated, which included: assault (9/30/97); disorderly conduct (3/20/97, 5/28/95); and, fighting (11/24/96, 12/26/95). Resp't's Br., *Final Notice of Parole Denial, Ex. 9.* The Panel noted that Petitioner does not participate in any form of rehabilitation and that he does not intend to participate in such in the future. Resp't's Br., *Cuban Review Summary Sheet, Ex. 10.* With respect to Petitioner's interview, the Panel noted that Petitioner "uses several aliases," "seems to have no remorse other than his admitted drug use," down plays his assaults against a law enforcement officer, and "flatly denies his involvement in the shooting in Cuba," thereby contradicting the testimony he provided during previous interviews. *Id.* The Panel also noted that Petitioner's second assault on a law enforcement officer occurred after he was released by a previous Cuban Review Plan panel. *Id.*

The Panel next reviewed Petitioner's detention on February 11, 2000. Resp't's Br., *Cuban Review Summary Sheet, Ex. 7.* In deciding whether he was an appropriate candidate for parole, the Panel considered Petitioner's criminal history, a mental health evaluation performed on January 18, 1999, and the testimony he provided during an interview conducted on February 10, 2000. *Id.* Following a discussion of his arrest and conviction in 1994 for battery of a law enforcement officer during the interview, the Panel noted that Petitioner's account of the events contradicted that which was included in the police re-

port. *Id.* After reviewing Petitioner's testimony, disciplinary reports, and criminal history, the Panel concluded that Petitioner has violent tendencies, does not assume full responsibility for his behavior, and is not credible. *Id.* The Panel elected to deny his request for parole, citing Petitioner's lack of remorse for his past crimes, lack of respect for law enforcement officials, and lack of a support system in place to assist in his reintegration into society as its reasons for so deciding. *Id.*

The most recent Panel review occurred on June 25, 2001. Resp't's Br., *Cuba Review Summary Sheet, Ex. 2.* The Panel referenced Petitioner's progress report, which indicated that he has not been involved in any disciplinary incidents and has enrolled in ESL. *Id.* During his interview, Petitioner admitted to having been addicted to cocaine for eight to ten years but claimed that he never sold drugs. *Id.* He also stated that he has not completed a drug rehabilitation program. *Id.* Petitioner stated that, if released, he would contact his sponsor, whom he has never met in person but with whom he has communicated via telephone and email. *Id.* While he had no definite plans for employment, he stated that he is able to work as a painter. *Id.* In finding that he was not credible during the interview, the Panel relied considerably on Petitioner's recollection of an altercation he had with a police officer and noted that Petitioner's version of the events conflicted with a previous version he had given, as well as with the police report. *Id.*

The Panel ultimately decided to deny Petitioner parole once again because it could not conclude that he was presently nonviolent, was likely to remain non-violent, or was not likely to pose a threat to the community following his release. *Id.* Reasons given in support of this conclusion included Petitioner's testimony regarding his altercation with the police officer, the

fact that he has not attended drug treatment or anger management programs, and the lack of support system in place for his release. *Id.*

■ On September 18, 2001, Petitioner received a Notice of Releasability and was scheduled to begin a residential drug treatment program at FCI Englewood, Colorado, on March 8, 2002, in anticipation of his eventual placement with a suitable sponsor, pursuant to the criteria established in the Cuban Review Plan. Resp't's Br., *Notice of Releasability, Ex. 1;* Resp't's Br., *Fomich Declaration*, para. 4–6. Petitioner has not withdrawn the present Petition, however, and neither party has notified the Court of any change of address. Accordingly, the Court will proceed based upon the best information available to it that Petitioner remains in custody at FCI–Fort Dix.[3]

### DISCUSSION

I. *Applicability of Zadvydas to Petitioner's case*

■ Petitioner, an inadmissible alien, argues that *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), should be read as applying to both deportable and inadmissible aliens. In

*Zadvydas*, the United States Supreme Court held that 8 U.S.C. § 1231(a)(6) did not permit the INS to indefinitely detain two deportable aliens, who had been ordered removed from the United States, because nothing in the legislative history of the statute indicated Congress' intention to authorize indefinite detention. *Id.* at 699, 121 S.Ct. 2491. Instead, the Court interpreted the statute as limiting the postremoval detention period to a reasonable time and recognized six months as constituting the presumptively reasonable amount of time upon which to effectuate removal. *Id.* at 699–701, 121 S.Ct. 2491. Notably, the Court interpreted the statute "in order to avoid a serious constitutional threat" to the liberty interest of aliens incurred by indefinite and potentially permanent detention. *Id.* at 699, 121 S.Ct. 2491. In so doing, the Court refrained from considering both the government's claim that *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215–16, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (explaining that rights accorded to excludable aliens derive from Congress) supports indefinite detention on the basis of alien status itself and the petitioner's claim that *Mezei's* legal authority is questionable in light of subsequent developments.[4] *Id.* at 694.

**3.** Moreover, despite the Notice of Releasability, the Petition is not moot because Petitioner remains in INS custody and his release is subject to several conditions. *See, e.g., Rosales–Garcia v. Holland*, 238 F.3d 704, 714 (6th Cir.) (explaining that a section 2241 petition for habeas relief is not rendered moot by virtue of the fact that petitioner has been notified of his releasability, since petitioner's parole under the Notice of Releasability was conditioned on finding a suitable halfway house and his continued good behavior), *vacated on other grounds*, 534 U.S. 1063, 122 S.Ct. 662, 151 L.Ed.2d 577 (2001).

**4.** According to the Supreme Court in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953), an alien who seeks but is not granted "entry" into this country is treated, for constitutional

purposes, "as if stopped at the border." Such legal classification applies, notwithstanding the fact that the alien has been allowed physical entry beyond the United States border pending a determination of admissibility. *Id.* In *Mezei*, the Supreme Court addressed the lawfulness of an alien's detention on Ellis Island, for a period of 20 months, with no end in view. *Id.* at 208–09, 73 S.Ct. 625. In holding that the indefinite detention of the petitioner did not constitute a deprivation of constitutional or statutory rights, *id.* at 215, 73 S.Ct. 625, the Court first looked to the Passport Act of 1918, which granted the Attorney General the authority to exclude aliens whose "entry would be prejudicial to the interest of the United States." *Id.* at 210–11 n. 7, 8, 73 S.Ct. 625. Next, the Court examined whether any constitutional protections provided for petitioner's release but ultimately

Arguably, therefore, the Supreme Court left open for another time the question of whether potentially indefinite detention infringes upon whatever constitutional rights are afforded inadmissible aliens.

In *Zadvydas v. Davis,* the petitioners were resident aliens, who had been detained beyond the customary 90–day removal period following a final order of removal and who were challenging their detention pursuant to 8 U.S.C. § 1231.[5] *Id.* at 682, 121 S.Ct. 2491. At the outset, the Supreme Court noted that the question presented was one of statutory construction. *Id.* Specifically, the issue was "whether this post-removal-period statute [8 U.S.C. § 1231(a)(6)(1994)] authorizes the Attorney General to detain a removable alien *indefinitely* beyond the removal period or only for a period *reasonably necessary* to secure the alien's removal." *Id.* Before embarking on an exercise in statutory interpretation, the Court noted that the statute at issue pertained to various categories of aliens and included inadmissible aliens within that list. *Id.* at 688, 121 S.Ct. 2491. The Court then explained that, in analyzing whether the statute permits indefinite detention, the Court would employ the doctrine of constitutional avoidance and interpret the statute so as to avoid "a serious constitutional problem."

*Id.* at 690, 121 S.Ct. 2491. Of primary concern to the Court was the interplay between civil confinement under the statute there and protections afforded by the Due Process Clause in the criminal context, since the Court had previously held that "government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections or, in certain special and 'narrow' non-punitive circumstances where a special justification ... outweighs the 'individual's constitutionally protected interest in avoiding physical restraint." *Id.* Justifications for the indefinite detention of aliens simply did not appear to advance the specified purpose or goals of the statute, and the administrative procedures set forth under the statute did not comport with the procedural due process required when liberty interests were at stake. *Id.* at 690–92, 121 S.Ct. 2491.

At this point in the opinion, it might appear that the Court was speaking broadly and was concerned with the constitutional implications of the statute vis-a-vis each of the alien classes enumerated therein, *i.e.,* inadmissible, removable, and those that have been determined to be a risk to the community or unlikely to comply with a removal order. However, it simply can-

---

concluded that the due process rights of inadmissible aliens, *i.e.* those who have been denied an entry into the United States, are not identical to those who have effected entry. The *constitutional argument failed, as the* Court explained, because "an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.' " 345 U.S. at 212, 73 S.Ct. 625 (quoting *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950); *Nishimura Ekiu v. United States,* 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892)). Thus, the petitioner's temporary harborage at Ellis Island, an act of "legislative grace," neither

converted his circumstances to an "entry" nor bestowed upon him any additional rights that any other alien seeking initial entry would not have had. *Mezei,* 345 U.S. at 215, 73 S.Ct. 625.

**5.** Section 1231(a)(6) (1994) provides, in pertinent part:

"An alien ordered removed [1] who is inadmissible ... [2][or] removable [for specified reasons] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision ...."

not be said that the Court was addressing the constitutional rights of every category of alien under the statute because, in countering the government's argument that alien status alone could justify indefinite detention, the Court implicitly confined its holding to the removable alien petitioners before them. *Id.* at 692–94, 121 S.Ct. 2491. The Court dismissed the government's contention by distinguishing the facts in *Mezei* with those at bar, noting that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Id.* at 693. That is, the Supreme Court's decision in *Zadvydas* did not interpret 8 U.S.C. § 1231(a)(6) as applying equally to inadmissible aliens, for the Court impliedly acknowledged that a different issue would be presented had the petitioner been an inadmissible alien. Rather, the Court explicitly recognized a disparity between the constitutional rights afforded deportable aliens versus rights accorded to inadmissible aliens, by distinguishing the status of the inadmissible alien in *Mezei,* who is treated "as if stopped at the border," from that of the deportable petitioners before the Court. *Id.* ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to persons outside of our geographic borders.").

In fact, most courts do not read *Zadvydas* as elevating the status of inadmissible aliens, so as to require the INS to release Mariel Cubans from custody where it cannot be shown that repatriation is possible within the foreseeable future. The majority of federal courts that have addressed the constitutional rights of inadmissible aliens in the context of potentially indefinite detention since *Zadvydas* have concluded that inadmissible aliens are not afforded the same Due Process rights as deportable aliens and, hence, are not *ipso facto* entitled to release when deportation

to their country of origin is unlikely in the reasonably foreseeable future. *See Singh v. I.N.S.,* 35 Fed. Appx. 469, 472, 2002 WL 858081, at *3 (9th Cir.2002); *Guerra v. Olson,* 24 Fed. Appx. 617, 619, 2001 WL 1646779, at *1 (7th Cir.2001); *Hoyte–Mesa v. Ashcroft,* 272 F.3d 989, 991 (7th Cir. 2001) (holding that continued detention does not violate an excludable alien's due process rights since "the Fifth Amendment does not offer [excludable aliens] the same protections as resident aliens"), *cert. denied,* —— U.S. ——, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); *Ma v. Ashcroft,* 257 F.3d 1095, 1107 (9th Cir.2001) (explaining that excludable aliens are "not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States."); *Perez–Leal v. I.N.S.,* No. 01–1577, 2002 WL 1347750, at *2 (D. Minn. June 13, 2002) ("Because the Court in *Zadvydas* indicated that *Mezei* remains good law, the Magistrate Judge appropriately found that the *Zadvydas* decision should be construed narrowly to apply to resident aliens but not to excludable aliens."); *Chavez–Rivas v. Olsen,* 207 F.Supp.2d 326 (D.N.J.2002); *Pan v. Ashcroft,* No. 02–2712, 2002 WL 1497115, at *2 (E.D.Pa. July 8, 2002) ("The *Zadvydas* Court confirmed that 'excludable/inadmissible' aliens seeking entry have no constitutional right to be at large in this country, and may be detained indefinitely."); *Beltran–Leonard v. I.N.S.,* No. 3:00cv2142–G, 2001 WL 1112552, at *3 (N.D.Tex. Aug. 15, 2001) ("[T]he Supreme Court's decision in *Zadvydas* does not apply to aliens . . . who have merely been paroled into the country."); *Fernandez–Fajardo v. I.N.S.,* 193 F.Supp.2d 877, 885 (M.D.La.2001) ("*Zadvydas* addresses only the post-removal-period detention of resident aliens who are later declared removable."); *Nodarse v. United States,* 166 F.Supp.2d 538 (S.D.Tex.2001); *Damas–Garcia v. United States,* No. 01–716, 2001 WL 1231480

(D.N.J. Oct. 17, 2001); *Rollaro–Suarez v. Pratt,* No. 3–01–CV–1419–G, 2001 WL 1512026 (N.D.Tex. Oct. 31, 2001).

Moreover, this Court disposed of the contention that the *Zadvydas* holding should be read as applying equally to both deportable and inadmissible aliens. *Damas–Garcia v. United States,* No. 01–716, 2001 WL 1231480, at *4 (D.N.J. Oct. 17, 2001) ("[The *Zadvydas* Court] made it clear that its decision . . . did not apply to aliens who have merely been paroled into the country."). Specifically, this Court determined that "because petitioner is an excludable alien, his claim that the distinction between excludable and other aliens is unconstitutional is without merit." *Id.* at *5. Thus, it follows that the petitioner at bar, an inadmissible alien, cannot succeed on a petition for habeas relief in this Court by arguing that *Zadvydas* effectively expounded additional constitutional rights for inadmissible aliens or that *Zadvydas'* statutory holding applies to all aliens uniformly, because the Supreme Court made certain to note that "the nature of [Due Process protection afforded aliens] may vary depending upon status and circumstance." *Zadvydas,* 533 U.S. at 694, 121 S.Ct. 2491.

Although Petitioner does not argue such, this Court also declines to follow those courts that have read *Zadvydas* as applying to inadmissible aliens for the reason that the Supreme Court applied the statute without explicitly limiting its reach to one class of alien or another; and, therefore, as a matter of statutory interpretation, both classifications must be treated alike under 8 U.S.C. § 1231(a)(6). *See, e.g., Xi v. INS,* 298 F.3d 832 (9th Cir.2002); *Borrero v. Aljets,* 178 F.Supp.2d 1034 (D.Minn.2001). The canon of constitutional avoidance does not mandate that the Supreme Court's statutory holding in *Zadvydas* apply uniformly to all aliens, irrespective of legal status. The District Court for the District of New Jersey's recent decision in *Chavez–Rivas* is instructive here, for the court framed the issue as whether *Zadvydas'* statutory holding would apply equally to inadmissible aliens. *Chavez–Rivas v. Olsen,* 207 F.Supp.2d 326 (D.N.J.2002). In *Chavez–Rivas,* the court found plausible petitioner's argument that "although in some circumstances lower courts may be free to follow the broadest meaning of a statute narrowed by the Supreme Court, the language of § 1231 in particular cannot support differing meanings in different contexts," *id.* at 334, but ultimately concluded that IIRIRA could be read as differentiating between inadmissible and deportable aliens, as "Congress would have wanted to sever the plainly constitutional from the possibly unconstitutional aspects of the statute." *Id.* at 337. The court, however, refuted outright petitioner's contention that "once the Supreme Court has interpreted a statute to avoid a constitutional question, the Court's interpretation remains authoritative even in circumstances that would not present any constitutional difficulty." *Id.* at 334. Employing the canon of constitutional avoidance in such a fashion "would dramatically expand the power of the courts at the expense of Congress." *Id.* Instead, courts should "avoid constitutional problems only as to those portions of the statute that present constitutional difficulties." *Id.*

Thus, *Chavez–Rivas* instructs that federal courts not adopt a blanket rule whereby once the Supreme Court interprets a statute in one context in order to avoid a constitutional problem, the same interpretation applies in other contexts that do not implicate identical constitutional considerations. Because the *Zadvydas* Court recognized that inadmissible and deportable aliens stand on different constitutional grounds and did not overrule *Mezei,* it follows that lower courts are not constrained by the decision, or the canon of

constitutional avoidance in particular, when examining whether the potentially indefinite detention of inadmissible aliens violates constitutional rights. Therefore, petitioner's argument for habeas relief in light of *Zadvydas* must fail. Because *Zadvydas's* statutory holding is inapplicable and because the majority of federal courts, in addition to Third Circuit precedent, have* upheld the constitutionality of the Cuban Review Plan, Petitioner is not entitled to habeas relief.

■ Furthermore, Petitioner has not shown that the Cuban Review Panel deprived him of procedural Due Process in this case. Because the procedures set forth under 8 C.F.R. § 212.12 are constitutionally firm and Petitioner received periodic individualized evaluations, assessing his risk of flight and danger to the community, in conformity with Cuban Review Plan regulations, Petitioner's procedural Due Process rights have not been violated at any time during his detention.

The procedures set forth under 8 C.F.R. § 212.12 for the Cuban Review Panel to follow when reviewing the circumstances surrounding the detention of a removable, inadmissible alien are constitutionally adequate; for, the procedures have been upheld in the Third Circuit vis-a-vis the procedural due process rights of inadmissible aliens. *See Ngo v. I.N.S.,* 192 F.3d 390, 399 (3d Cir.1999); *Damas–Garcia,* 2001 WL 1231480, at *7; *Chavez–Rivas,* 207 F.Supp.2d at 339–41 (interpreting *Ngo* as largely foreclosing a facial challenge to the Cuban Review Plan but finding that the Panel's use of past arrests, without any evidence that petitioner had committed the underlying crime charged, is inadequate to satisfy substantive due process). "Detention of aliens who have committed serious crimes and have been ordered deported, removed or excluded is constitutional, provided, *inter alia,* that the government provides for individualized periodic review of the alien's eligibility for release on parole. Procedural due process afforded to excludable aliens will not be satisfied, however, if the government 'rubber stamps' a request for parole based solely on the alien's prior offenses." *Damas–Garcia,* 2001 WL 1231480, at *6 (citations omitted).

Nothing in the record suggests that the requisite reviews of Petitioner's detention amounted to a "rubber stamp" denial of his release. Rather, the record reflects that Petitioner was afforded individualized reviews in accordance with the Cuban Review Plan and that, during each review, the Panel presented sufficient justification for its decision such that the Panel's determination cannot be regarded arbitrary or capricious. *See Damas–Garcia,* 2001 WL 1231480, at *3 ("In reviewing INS parole decisions, the standard of review for this Court is limited to whether the agency's decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' "); *see also Qureshi v. Ashcroft,* 47 Fed.Appx. 162, 165, 2002 WL 31160101, *3 (3d Cir.2002) (explaining that findings of fact determined by the Board of Immigration Appeals will be upheld "so long as they are supported by substantial evidence" and only will be reversed "if the evidence 'not only supports a contrary conclusion, but compels it' ").

■ The Cuban Review Panel considered the possibility of Petitioner's parole on three occasions since his return to INS custody on April 20, 1998. Resp't's Br., *Exs. 2, 7, 10.* On each occasion, the Panel recommended that Petitioner remain in INS custody after finding 1) his criminal history, 2) his noncredible responses to the questions posed during his interview, 3) his failure to participate in a drug rehabilitation program, and 4) his lack of remorse for his past criminal offenses to weigh against the possibility of successful reinte-

gration into the community. *Id.* There is no evidence in the record suggesting that any of the three Cuban Review Panels arbitrarily or capriciously denied petitioner release from INS custody or otherwise acted unlawfully during the review or in reaching its decision. To the contrary, the Panels arrived at the determination to deny release after considering Petitioner's personal interview, criminal history, mental health evaluations, institutional employment, and failure to complete substance abuse or anger management programs that prepare for successful reintegration into the community. *Id.* Petitioner's demeanor during his interviews, his extensive criminal history, and his failure to seek drug treatment or behavior programs provide a reasonable basis upon which to conclude that his release could pose a danger to society. As of the latest Panel review, which occurred on June 25, 2001, Petitioner still had not completed a drug rehabilitation or anger management program to address his drug addiction and tendency to engage in violent behavior, nor did he accept responsibility for his involvement in the altercation with a police officer. Resp't's Br., *Cuba Review Summary Sheet, Ex.2.* This Court finds the Panel's determination to deny his release reasonable and, accordingly, is not free to second-guess the decision.

## CONCLUSION

The petition for habeas relief should be denied because *Zadvydas* does not apply to inadmissible aliens. In addition, the Court need not apply the canon of constitutional avoidance while interpreting the statute in the context of inadmissible aliens since the potentially indefinite detention of inadmissible aliens does not raise the same constitutional concerns vis-a-vis deportable aliens, and the Cuban Review Plan has been upheld as constitutional in the Third Circuit. Furthermore, petitioner's procedural due process rights are not violated by the Cuban Review Plan. The accompanying Order will be entered.

## ORDER

This matter having come before the Court upon Petitioner Humberto Herrero–Rodriguez's application for habeas corpus relief pursuant to 28 U.S.C. § 2241, and the Court having reviewed the submissions of the parties, and for the reasons stated in the Opinion of today's date;

IT IS, this *18th* day of November, 2002, hereby

ORDERED that Petitioner's application for a writ of habeas corpus is **DENIED**; and,

IT IS FURTHER ORDERED that no certificate of appealability shall issue.