**Refugio SILVA et al.,
Plaintiff-Appellees,**

v.

**Griffin B. BELL, United States Attorney General, et al., Defendant-Appellants.**

**No. 79–1154.**

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1979.

Decided Aug. 23, 1979.

As Corrected Sept. 26, 1979.

As Modified on Rehearing Oct. 18, 1979.

Lauri Steven Filppu, Dept. of Justice, Washington, D. C., for defendants-appellants.

Bruce L. Goldsmith, Chicago, Ill., for plaintiffs-appellees.

Before CUMMINGS and TONE, Circuit Judges, and CAMPBELL, Senior District Judge.*

TONE, Circuit Judge.

During the period from 1968 to 1976, 144,999 Cuban refugees were granted permanent resident status pursuant to the Cuban Adjustment Act of 1966, Pub.L. No. 89–732, 80 Stat. 1161. The visa numbers assigned to them were charged against the

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

Western Hemisphere immigration quota, thereby making those visa numbers unavailable to applicants from Western Hemisphere countries other than Cuba. In 1976 it was determined that the Cuban charging was in error. The question in this case is how the erroneously charged visa numbers should be allocated among the Western Hemisphere applicants on the waiting list, chronologically without regard to national origin, as plaintiffs contend and the district court ordered, or in accordance with the historical immigration patterns for the countries involved, as the defendants contend. Also in issue are the standing of class members who are non-resident aliens, the proper composition of the plaintiff class, and the need for subclasses.

Plaintiffs sue on behalf of themselves and a class of visa applicants from Western Hemisphere countries whose applications were filed between July 1, 1968, and December 31, 1976, but have not yet been processed. Defendants are the Attorney General of the United States, other federal officials responsible for the implementation of the immigration laws, the Immigration and Naturalization Service (INS), and the Department of State.

## I

### The Facts

An understanding of the problem presented requires knowledge of the recent history of the Immigration and Nationality Act and the defendants' errant attempts to implement amendments to the Act and later to correct earlier mistakes.

When Congress enacted the present Immigration and Nationality Act in 1952, Pub.L. No. 82–414, 66 Stat. 163, see 8 U.S.C. §§ 1101 et seq., it placed no restriction on the number of Western Hemisphere [1] immigrants who could obtain permanent residence visas. 8 U.S.C. § 1101(a)(27)(C) (1964). In the 1965 amendment of the Act, Pub.L. No. 89–236, 79 Stat. 911, Congress created a select commission to study the problems of Western Hemisphere immigration and to recommend appropriate changes in the immigration laws, id. at §§ 21(a) through (d), 79 Stat. 920–921. Western Hemisphere immigrants were classified as "special immigrants," id. at § 8, 79 Stat. 916, but were not immediately subject to any quota. Congress did, however, provide that unless it enacted legislation to the contrary in the intervening time period, a numerical limitation on Western Hemisphere immigrants of 120,000 per fiscal year would become effective on July 1, 1968. Id. at § 21(e), 79 Stat. 921.

After the adoption of the 1965 Amendment but before the effective date of the § 21(e) quota on Western Hemisphere immigration, Congress enacted the Cuban Adjustment Act, Pub.L. No. 89–732, 80 Stat. 1161 (1966), to alleviate the barrier to permanent residence that immigration laws interposed for Cuban political refugees who had fled from Cuba to the United States after the revolution in that country. Admitted to the United States by the Attorney General pursuant to his discretionary parole power, 8 U.S.C. § 1182(d)(5), these refugees did not have visas granting them permanent residence status. Because, as § 1182(d)(5) prescribes, parole admittance is temporary and a paroled alien must eventually either secure a visa through regular procedures or return to his country of origin, these refugees sought visas. Regular procedures for visa application required contact with a consular post abroad.[2] Most

1. The Western Hemisphere consists of "Canada, the Republic of Mexico, the Republic of Cuba, the Republic of Haiti, the Dominican Republic, the Canal Zone, [and the] independent countr[ies] of Central [and] South America." Pub.L. No. 82–414, § 101(a)(27)(C), 66 Stat. 169 (1952), superseded effective December 1, 1965, by 22 C.F.R. § 42.1.

2. An alien seeking a visa initiated the application process by submitting, or having sub-mitted on his behalf, to a consular officer or the INS certain required documentation relevant to eligibility. After this filing the applicant was placed on the waiting list, his "priority date" on that list being the date on which the requisite filing was completed. 22 C.F.R. § 42.62 (1967). Applications were processed in chronological order based on priority dates, without regard to an applicant's country of origin. Id. When an applicant's priority date was reached he was

refugees, however, could not establish this necessary contact. The United States consulate in Cuba had been closed since 1961, making it impossible for Cubans to obtain visas in their native land. Many of the refugees arrived in this country in an impoverished state and were unable to pay for a trip outside the United States to visit a consulate. The closest consulates, those in Mexico and Canada, had lengthy waiting lists, which exacerbated the problem. Adjustment of status, the only avenue by which visa applicants already present in the United States could avoid the trip to a foreign country, 8 U.S.C. § 1255 (1970), was unavailable to natives of Cuba, 8 U.S.C. §§ 1255(c) and 1101(b)(5) (1970). In the Cuban Adjustment Act, Congress granted the Attorney General authority to adjust the status of any Cuban native or citizen who had been lawfully physically present in the United States for at least two years to that of permanent resident alien.

As the conditionally effective date of the § 21(e) Western Hemisphere quota approached, it became apparent that Congress would not enact countermanding legislation. Because the Cuban Adjustment Act did not expressly address the issue, defendants had to determine whether Congress had intended that Cuban "adjustees" be charged against the Western Hemisphere quota. Without formally explaining its reasons for doing so, the INS adopted the policy of charging the Cubans against the quota; apparently with some reluctance, the Department of State acquiesced in this decision.

The charging commenced on July 1, 1968, and continued for over eight years. In 1975 and 1976 several individual actions were filed by visa applicants challenging the charging policy. While these actions were pending the Attorney General re-examined the policy. The Justice Department's Office of Legal Counsel concluded in a memorandum that "Cuban refugees whose status is adjusted to that of alien admitted for permanent residence are not to be counted against the Western Hemisphere quota." Thereupon, on August 31, 1976, the Attorney General ordered the INS to alter its policy to conform with the position stated in the memorandum. The INS complied with this order on October 1, 1976. By that time, however, 144,999 Cuban adjustees had been charged against Western Hemisphere quotas. During the period the Cuban charging took place, each Cuban adjustee was charged against the Western Hemisphere quota for the year in which his status was adjusted.

On October 20, 1976, before the 144,999 erroneously charged visa numbers could be reclaimed and allocated to waiting applicants, Congress again amended the Immigration and Nationality Act, Pub.L. No. 94–571, 90 Stat. 2703. The 1976 Amendment retained the 120,000 person per year quota on total Western Hemisphere immigration, see 8 U.S.C. § 1151(a), and, in addition, imposed a limit of 20,000 on the total number of immigrant visas available in a fiscal year to natives of any single Western Hemisphere state. That limit became effective on January 1, 1977. Pub.L. No. 94–571, § 3(2), 90 Stat. 2703. This new quota reduced Mexican immigration to this country by as much as 50 per cent and thus "made room" for increased non-Mexican immigration under the total Western Hemisphere immigration quota. Because only Mexicans have sought visas in numbers exceeding 20,000, the length of time Mexicans must wait to have their applications processed has increased, and concomitantly, the percentage of Mexicans on the waiting list has grown since January 1, 1977.[3] The 1976 Amendment also extended the preference system, formerly applicable only to Eastern Hemisphere immigration, to Western Hemisphere immigration, id., at § 7, 90 Stat. 2706, but that feature of the Amendment

scheduled for a final interview at a consular post for the purpose of establishing his eligibility. Applicants successfully bearing their burden of proof at the interview received visas granting entry into the United States as lawful permanent resident aliens.

3. See note 16, accompanying text, and Diagrams 2 and 3, infra.

does not concern us.[4] The new 20,000-per-country quotas established by the 1976 Amendment, although they did not become effective until three months after the Cuban charging ceased and one and one-half months after this action was filed, are the major cause of difficulty in shaping appropriate relief in this case, as we shall explain later.

Plaintiffs filed this action on November 18, 1976, contending that defendants' charging policy violated the Immigration and Nationality Act and the due process clause of the Fifth Amendment, and seeking, *inter alia*, to compel defendants to "recapture" the visa numbers assigned to Cuban refugees and reissue those numbers to members of the proposed plaintiff class. On January 12, 1977, the district court certified the plaintiff class, defined as follows:

All natives from independent countries of the Western Hemisphere who have been assigned priority dates for the issuance of immigrant visas between July 1, 1968 and December 31, 1976, and those priority dates have not yet been reached for processing and who have not been called for final immigrant visa interviews.

Insofar as is relevant here, the next significant event occurred on June 21, 1977, when defendants entered into a stipulation with the plaintiffs in *Zambrano v. Levi*, 76–C–1456, a related individual action pending before the trial judge to whom the instant case was assigned. In that stipulation defendants conceded that the challenged charging policy was in error; the court ordered defendants to recapture two of the wrongfully issued visa numbers and reissue them to the *Zambrano* plaintiffs. Remaining before the district court in this case after defendants' concession of liability was the question of relief, *i.e.*, how to distribute the wrongfully issued visa numbers. Shortly after the *Zambrano* order was entered, defendants took it upon themselves to design a program to recapture and reissue the remaining wrongfully issued

visa numbers, and by August, 1977, had commenced redistribution of these numbers without having consulted with plaintiffs or obtained the permission of the court.

In designing their original recapture and reissuance program, defendants relied on estimates of the size of the plaintiff class made from the annual statistical reports submitted by the Western Hemisphere consular posts. Based on these reports, defendants assumed, first, that only Mexican class members would require recaptured visa numbers because there would be enough unused numbers for non-Mexican class members under the quotas instituted by the 1965 and 1976 Amendments, and second, that the recaptured visa numbers would suffice to satisfy the needs of all Mexican class members. Hence defendants issued recaptured visa numbers only to Mexican class members, despite opposition from counsel for plaintiffs, who warned that defendants' estimates were inaccurate. The manner in which defendants reissued the visa numbers to Mexican class members was also contrary to the demand of plaintiffs' counsel that reissuance be conducted in strict chronological order, without regard to national origin. Mexican class members who could and did qualify for preference classification under the 1976 Amendment received preferential treatment in the issuance of recaptured visa numbers.

In February 1978, it became apparent from the annual report submitted by the Western Hemisphere consular posts that defendants had significantly underestimated the numbers of both Mexican and non-Mexican class members. Defendants thereupon began processing Mexican class members who established preference status for current visa numbers under the annual 20,000 person quota and nonpreference Mexican class members for recaptured visa numbers in strict chronological order. Although defendants admit in their brief that they then realized that non-Mexican class members

4. The preference system is a classification of visa applicants subject to quotas under 8 U.S.C. § 1151(a), based on such factors as relation to United States citizens or permanent resident aliens, or employment qualifications. The classification determines the order in which those applicants are allotted visas. 8 U.S.C. § 1153; 22 C.F.R. §§ 42.30–42.36.

would also need recaptured visa numbers, they apparently did not alter their program to accommodate this need at that time.

Finally, in May 1978, defendants performed a major restructuring of their program, adopting what they term a "historical approach" to recapture and reissuance. This approach is an attempt to factor out the effects of the 20,000-per-country quotas introduced by the 1976 Amendment, effects which are not properly remediable, and to issue recaptured visa numbers based solely on the harm resulting from the charging policy. Defendants' historical approach embodied the following procedure for issuing the recaptured visa numbers: first, determine how many visa numbers were charged to Cuban adjustees in each of the relevant fiscal years; second, determine what percentage of the properly issued visa numbers was awarded to applicants from each of the Western Hemisphere nations in each of the relevant fiscal years; third, issue the visa numbers recaptured from each year so that they are apportioned among plaintiff class members from each nation in the same percentage that immigrants from that nation received properly issued visa numbers in that fiscal year.[5] We assume, although the record does not show, that within each national group recaptured visa numbers were issued to applicants on a chronological basis.

Plaintiffs, as we have said, did not approve of defendants' original recapture pro-

gram, and in February 1978 they moved to enjoin further visa issuance pursuant to it. In responding to the motion, defendants notified plaintiffs of the subsequent restructuring of the program; plaintiffs also disapproved of the restructured program and moved to halt its implementation. The district court denied plaintiffs' motion for injunctive relief on June 7, 1978, but, following additional discovery and a hearing, the court approved plaintiffs' proposed plan of relief and ordered the processing of the current waiting list of class members in strict chronological order.[6] The district court stayed, during the pendency of this appeal, the portion of its judgment requiring that visa applications for the recaptured numbers be processed in strict chronological order.

## II

### The Nature of the Injury

Stated simply, the Cuban charging injured plaintiff class members by delaying the processing of their visa applications. Visa numbers were available in limited quantities, 120,000 per fiscal year. Demand exceeded supply. Each visa number issued to a Cuban adjustee therefore not only reduced by one the number of Western Hemisphere natives admitted to the United States in the year of its issuance but also prevented persons on the waiting list from

5. For example, assume that in the first fiscal year in which unlawful charging occurred, visa numbers were erroneously allocated to 1,000 Cuban adjustees; assume further that the remaining visa numbers were assigned to applicants from the following Western Hemisphere nations in the following percentages: Mexico, 45%; Canada, 15%; Brazil, 10%; Venezuela, 10%; Peru, 10%; Bolivia, 10%. The 1,000 recaptured visa numbers would be distributed to plaintiff class members native to these countries in the same percentages, resulting in the following pattern of distribution: Mexico, 450; Canada, 150; Brazil, 100; Venezuela, 100; Peru, 100; Bolivia, 100. The same procedure would be repeated for each fiscal year in which unlawful charging occurred.

6. Congress enacted the most recent major amendment to the Immigration and Nationality Act on October 5, 1978, Pub.L. No. 95–412, 92 Stat. 907 (the One World Amendment). The

1978 Amendment combined the former Eastern and Western Hemisphere quotas into one quota for immigrants from both areas. Defendants asserted that this legislation would have the effect of reducing the number of Western Hemisphere nonpreference immigrants granted visas and would consequently slow the rate at which plaintiff class members would receive visas through normal procedures. Assuming this to be true, the 1978 Amendment does not in any event impose any selective factors on the order in which visa applications are processed, as did the 1976 Amendment; rather, it would appear to slow the application processing for all nonpreference applicants regardless of national origin. Because the 1978 Amendment has no new differential effects on the processing of visa applications of natives of the Western Hemisphere countries, it poses no additional obstacles to the shaping of relief.

advancing to the positions on the list they would have occupied but for the wrongful visa number issuance.[7]

## III

### Standing

Defendants argue that plaintiff class members outside the United States lacked standing and therefore should be dismissed from the action. The parties agree that the authorities do not answer the question whether nonresident aliens have standing to file suits concerning their rights under the Immigration and Nationality Act in the federal courts. *See Chinese American Civic Council v. Attorney General*, 185 U.S.App. D.C. 1, 5 & n.9, 566 F.2d 321, 325 & n.9 (1977).

■■■■ That class members residing in the United States have standing,[8] which is not challenged, establishes that the Article III "case or controversy" requirement of the standing doctrine is satisfied as to all class members. *Warth v. Seldin*, 422 U.S. 490, 498–499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The ability of a class member to "show that he personally has suffered some actual . . . injury [9] as a result of the . . . illegal conduct of the defendant[s]," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), is not affected by nonresidence.

Hence the question becomes, whether standing should be denied by reason of the "prudential principles" which sometimes dictate a denial of standing even though the Article III standing requirement is satisfied. Despite policy reasons for not generally "affording a Federal forum for a person anywhere in the world challenging denial of entry or immigration status . .," *Chinese American Civic Council v. Attorney General*, 396 F.Supp. 1250, 1251 (D.D.C. 1975), *aff'd on other grounds, Chinese American Civic Council, supra*, 185 U.S.App. D.C. 1, 566 F.2d 321, this is a case in which the prudential principles weigh in favor of granting standing.

■■■ As defendants themselves acknowledge,

> The practicalities of issuing recaptured numbers [*i.e.*, of granting the relief sought in this case] dictate similar treatment for similarly situated aliens, both within and without the United States.

Prudence, or "self-restraint," *see Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), would not have us deny standing to many thousands of class members who satisfy the Article III standing requirement when the presence of many thousands of other plaintiffs will require the action to continue and the process of "weeding out" the former undoubtedly would be costly and time-consuming, further forestalling relief to the other plaintiffs.[10] Justice and judicial economy are served by allowing visa applicants outside the United States to remain as members of the class.[11] The district court's holding that

---

7. Since not every applicant ultimately received a visa number, the charging of a Cuban visa number displaced everyone on the waiting list by more than one position.

8. *See Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 91 S.Ct. 1312, 28 L.Ed.2d 592 (1971); *Chinese American Civic Council, supra*, 185 U.S. App.D.C. at 5 & n.8, 7 n.15, 566 F.2d at 325 & n.8, 327 n.15; *see generally Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950).

9. *See* Part II of this opinion, *supra*.

10. The District of Columbia Circuit's decision in *Jaimez-Revolla v. Bell*, 194 U.S.App.D.C.

324, at 327, 598 F.2d 243, at 246 (1979), suggests that at least those plaintiff class members presently outside the United States who once resided in the United States might have standing because of their previous residence here. Because of our conclusion that standing exists in any event, we need not consider this point.

11. Also, requiring residence in the United States might encourage aliens to enter the country illegally to acquire standing to prosecute their own individual claims. *See Brownell v. Tom We Shung*, 352 U.S. 180, 182–184 & n.3, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956); *Chinese American Civic Council, supra*, 185 U.S.App. D.C. at 7 n.15, 566 F.2d at 327 n.15; *see generally Shaughnessy v. United States ex rel. Mez-*

all members of the plaintiff class have standing to sue is sustained.[12]

## IV

### The Appropriate Relief

■ Both parties agree that relief, in the form of a program to recapture and reissue the wrongfully issued visa numbers, is appropriate. The parties also appear to agree that the recaptured visa numbers should be allocated in the manner that will place plaintiff class members, as near as may be, in the positions they would have occupied but for the Cuban charging policy.[13] The parties do not agree, however, on how to effectuate this goal.

Absent the effects of the 20,000-per-country quota imposed by the 1976 Amendment, shaping relief to restore plaintiff class members to the approximate positions they should have occupied would have been a simple task. As the parties agreed at oral argument, if it had been possible to effect complete relief as soon as the entitlement of each of the plaintiff class members was established and before January 1, 1977, the effective date of the 1976 Amendment, the proper procedure would have been to process the applicants in strict chronological order based on their priority dates, *i.e.,* in their order on the waiting list, until defendants had either issued all the visa numbers or processed the applications of all plaintiff class members. This action would have had the effect of advancing each of the plaintiff class members on the list approximately as many places as he or she had lost through the Cuban charging policy. This was the relief each applicant on the list was entitled to at that time, and that relief should not be denied because of either lapse of time or an extraneous event.

The 1976 Amendment complicated matters by adding country of origin as a factor affecting the order in which defendants

---

*ei,* 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953).

**12.** Defendants raise two other issues which we resolve summarily before addressing the primary issue of relief.

First, although never having raised the point before, defendants now assert that conflicts exist among class members because of the limited number of recaptured visa numbers that are available, and argue that the class should be subdivided and an attempt made to obtain separate representation for each interest. Plaintiffs oppose this position, and no class member has ever suggested it. It appears that there are two potential subclasses: (1) Mexican visa applicants, who stand to benefit from the chronological approach at the expense of at least some applicants from other countries, and (2) applicants from other countries, some of whom at least would benefit from a historical approach at the expense of the Mexican applicants. We do not deprecate the importance of having conflicting interests separately represented, and if defendants had timely moved to subdivide the class their motion would have had merit. Under the peculiar circumstances of this case, however, we believe that at this late date the class should not be subdivided for separate representation. Plaintiffs have forcefully presented the arguments in favor of the chronological approach, thereby adequately representing the interests of the Mexican class members. Defendants' similarly forceful arguments in support of the historical approach, coupled with the assertions of plaintiffs' counsel that all recaptured visa numbers must be reissued, have placed before this court the position a non-Mexican subclass would have taken. Furthermore, since we are persuaded that defendants' historical approach, modified to require distribution of all recaptured visa numbers, is correct, and have therefore adopted the position most favorable to the non-Mexican class members, they have not suffered any harm as a result of not having had separate counsel. What defendants propose would further delay relief that has already been too long withheld.

Defendants also contend that the district court erred in holding that the charging policy violated plaintiffs' due process rights. Regardless of the merits of that holding, it was unnecessary in light of the court's holding that the charging policy violated the Immigration and Nationality Act. Constitutional questions should not be decided unnecessarily. *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 568–574, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947). The recital of this holding in the judgment is stricken.

**13.** This proposition is simply an application of the tenet that equitable relief should "restore the plaintiff to the enjoyment of the right which has been interfered with to the fullest extent possible . . . ." *Graves v. Romney,* 502 F.2d 1062, 1064 (8th Cir. 1974), *cert. denied,* 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 440 (1975).

processed applications. As we explained in Part I of this opinion, the application of this selective factor in the ongoing processing of visa applications during the pendency of this suit has caused many applications of Mexicans to be passed over in favor of applications of non-Mexicans with later priority dates. Hence the percentage of Mexican class members has continuously increased, and the top of the current Western Hemisphere waiting list consists almost exclusively of Mexicans.

In order to achieve, as near as may be, the result that would have been obtained had it been possible to give relief before the effective date of the 1976 Amendment, the effects of the amendment must be factored out. To accomplish this, and thus to determine what plan of processing should be adopted, we have prepared the three schematic diagrams appearing below. Each diagram represents the waiting list as of December 31, 1978. Diagram 1 illustrates what the present status of members of the plaintiff class would be if relief had been effective immediately, before the advent of the 20,000-per-country quotas. Diagram 2 represents the effects the court-ordered chronological processing would have if affirmed here. Diagram 3 shows how defendants' historical approach would work if we were to adopt it.

The facts as depicted in the diagrams are simplified to make the analysis more readily comprehensible without affecting its validity. The relevant figures have been divided by 10,000. Thus in the diagrams it is assumed that

(a) a maximum of twelve Western Hemisphere natives may receive visas in a single year;

(b) no more than two visa recipients may come from any one country in one year; [14]

(c) fourteen recaptured visa numbers are to be distributed; and

(d) there are sixty names on the waiting list as of December 31, 1976 (the actual list contained 400,000 names, but using sixty rather than forty makes it possible to demonstrate the functioning of the plans more fully).[15]

For purposes of simplicity we also have assumed the following:

(1) that Mexican immigration in each of the relevant years constituted 50 per cent of the total Western Hemisphere immigration, and the waiting list on January 1, 1977 reflected that pattern, every second person on the list being Mexican;

(2) that two full years of application processing have passed since January 1, 1977, during which four Mexican class members and twenty non-Mexican class members have received visas through normal processing and during which defendants issued none of the recaptured visa numbers; and

(3) that all class members are qualified to receive visas.

The symbols used in the diagrams below have the following meanings:

even numbers represent Mexican class members;

odd numbers represent non-Mexican class members;

circles represent recipients of recaptured visa numbers;

boxes represent recipients of current Year 1 visa numbers; and

diamonds represent recipients of current Year 2 visa numbers.

Diagram 1 shows how the recaptured visa numbers would have been distributed if it had been possible to do so before the distorting effects of the 1976 Amendment were felt. This diagram thus shows the effect of first distributing all recaptured

---

14. Because the applicants from any Western Hemisphere country other than Mexico have not exceeded 20,000 per year, see text at note 3, supra, it is also assumed that not more than two non-Mexican applicants reached in any year are from a single country.

15. The district court found that "it is unlikely that there will be sufficient recaptured visa numbers to process all plaintiffs and class members," so our "expansion" of the waiting list does not render our diagrams inaccurate.

visa numbers and then distributing Year 1 and Year 2 visa numbers:

DIAGRAM 1 - Hypothetical Ideal

In Diagram 1 the recaptured visa numbers have been reissued in chronological order to persons on the waiting list, regardless of country of origin. Hence, persons 1 through 14 would have received these visa numbers. Thereafter, two Mexicans, 16 and 18, and ten non-Mexicans, 15, 17, 19, 21, 23, 25, 27, 29, 31, and 33 would have received visa numbers through normal processing in Year 1. Similarly, in Year 2, two Mexicans, 20 and 22, and ten non-Mexicans, 35, 37, 39, 41, 43, 45, 47, 49, 51, and 53 would have received visa numbers.

Diagrams 2 and 3 show how the recaptured visa numbers would be distributed according to the alternative proposed plans now that the distorting effects of the 1976 Amendment have taken place. These diagrams thus show the effects of first distributing current visa numbers for Years 1 and 2 and then distributing recaptured visa numbers according to the alternative plans. Diagram 2 shows the chronological, or court-ordered plan, and Diagram 3 the historical plan proposed by defendants:

DIAGRAM 2 - Court-ordered Relief

DIAGRAM 3 - Defendants' Historical Approach

In both diagrams, allocation of current visa numbers for each year is of course the same. Thus, during Year 1 two Mexicans, 2 and 4, and ten non-Mexicans, 1, 3, 5, 7, 9, 11, 13, 15, 17, and 19, received current Year 1 visa numbers; during Year 2 two Mexicans, 6 and 8, and ten non-Mexicans, 21, 23, 25, 27, 29, 31, 33, 35, 37, and 39, received current Year 2 visa numbers.[16]

The recaptured visa numbers are distributed differently in the two diagrams. Thus in Diagram 2, representing the chronological plan, all fourteen recaptured visa numbers are allocated to Mexicans, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28, 30, 32, 34, and 36. A comparison of the distribution of recaptured numbers in Diagrams 1 and 2 demonstrates that the court's order does not parallel the results of the ideal.

Diagram 3, representing the historical approach, produces a distribution of recaptured numbers that does simulate the ideal: 10, 12, 14, 16, 18, 20, and 22 of the Mexicans and 41, 43, 45, 47, 49, 51, and 53 of the non-Mexicans receive recaptured visas. A comparison of Diagrams 1 and 3 shows that defendants' historical approach produces the same distribution of recaptured visa numbers as the ideal. In both diagrams the persons remaining on the waiting list are as follows: 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46, 48, 50, 52, 54, 55, 56, 57, 58, 59, and 60. In Diagram 2, however, the persons remaining on the waiting list are as follows: 38, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, and 60. Thus, Diagram 3 produces the allocation that would properly have been made if relief

16. This provides an excellent illustration of how the 1976 Amendment affected the order of processing and, concomitantly, the composition of the waiting list; starting with Mexicans and non-Mexicans alternating on the list, after two years the first fourteen people on the waiting list, who would receive all the recaptured visa numbers, are Mexican.

could have been effected before the advent of the 1976 Amendment. Diagram 2 does not.

It is apparent from this demonstration that the proper object of relief is better served by defendants' historical plan than by the strict chronological plan ordered by the district court and advocated by plaintiffs. We recognize that in actual implementation the historical approach will not produce a perfect replication of the ideal, because the result will be affected by the sequence in which Mexican and other applicants' names happen to appear on the list, and because death and other causes have removed names from the list, thus advancing other names. The replication will, however, when corrected as provided below, be as accurate as the circumstances permit.

Plaintiffs have two objections to defendants' historical approach to the reissuance of recaptured visa numbers. First, they contend that the historical approach, by using national origin as a criterion for determining the order in which applications are processed, is inconsistent with the Congressional policy during the relevant period, *viz.*, that visa applications were to be processed chronologically without regard to national origin. Ignoring the effect of the 20,000-per-country quotas of the 1976 Amendment, however, as plaintiffs propose, would have the practical effect of skewing the results in favor of one national group, which is hardly consistent with pre-1976 Congressional policy. Congressional policy is not offended, and justice to all parties is best served, by achieving the result, as near as may be, that would have been achieved by a grant of the proper relief at the time plaintiffs became entitled thereto.

Plaintiffs also object to defendants' historical approach on the ground that it will not result in reissuance of all recaptured visa numbers, even though some class members might remain unprocessed. As defendants concede, plaintiffs are correct in stating this would be the result.[17] Because relief granted when plaintiffs' rights were established and before December 31, 1976, would have included reissuance of all the recaptured visa numbers or processing of all class members and issuance of as many recaptured visa numbers as there were qualified applicants, plaintiffs are entitled to that relief now. Fortuitous delay should not result in curtailment of the remedy.

We therefore reverse the final judgment order, in Paragraph 4 of which the district court ordered reissuance pursuant to a strict chronological processing procedure, and direct the court, on remand, to modify that order to conform with the following directions:

The court will adopt, as the basic format for reissuance, defendants' historical approach, set forth in the text accompanying note 5, *supra*. Two modifications of that plan are necessary, however, to insure maximum approximation of the pre-1977 ideal. First, the new plan must account for those recaptured visa numbers, between 68,000 and 69,000 in number, which had already been reissued by defendants before the district court entered its judgment. Fortunately, factoring out the effects of the unauthorized reissuance should not prove too difficult. The district court should first determine how many of the recaptured visa numbers issued before October 10, 1978, were given to natives of each of the Western Hemisphere countries. In implementing what we have described in the text accompanying note 5, *supra*, as the third step of their historical plan, defendants should reduce the number of recaptured visa numbers to be issued to plaintiff class members from each country by the number of recaptured visa numbers previously issued to natives of the respective countries.[18]

---

**17.** To illustrate, in the hypothetical set forth in note 5, *supra*, we determined that 100 recaptured visa numbers "belonged" to Bolivian visa applicants. If fewer than 100 qualified Bolivian class members remain, however, under defendants' approach the extra visa numbers are never reissued.

**18.** The following example will clarify this instruction: Referring to the hypothetical in note 5, *supra*, assume that the figures set forth there for the first fiscal year also hold true for the second and third fiscal years. Distribution pursuant to defendants' historical approach would have resulted in reissuance of recaptured visa

The second modification[19] is necessary to remedy the failure of defendants' plan to provide for the reissuance of all recaptured visa numbers. It involves adding a redistribution process to the distribution process already adopted by the government in its historical approach. Visa numbers shall continue to be allocated to each country according to its historical share computed on the basis of the eight-year cumulative totals from 1968 to 1976. Those visa numbers already issued pursuant to the unauthorized recapture program shall be credited against each country's total historical share. Should a country exhaust its total historical share of visa numbers, no further visa numbers would be allocated to it except under the redistribution process as described below.

Under the redistribution process, those historical share visa numbers which are unused shall be redistributed to countries with qualified visa demand[20] in excess of their total historical share. These unused visa numbers shall be redistributed to such countries in proportions equal to their relative historical use of visa numbers between 1968 and 1976. For example, assume Mexico, Colombia, and Jamaica are the only countries for which redistribution is required. Then, if Mexico received 75 per cent of the visa numbers issued to these three countries between 1968 and 1976, Mexico would receive 75% of the unused visa numbers. The redistribution percentages shall be recomputed, as necessary, to permit the addition or deletion of countries from the redistribution process.

The parties advise the court that it is highly probable that some countries will not exhaust their shares, with the result that other countries will necessarily participate in the redistribution of the unused numbers. Accordingly, as soon as practicable, the district court shall permit redistribution during the historical share distribution process, and require periodic recomputation of the quantity of unused visa numbers for redistribution to reflect the actual issuances. It is recognized that, even though unused visa numbers from a country have already been identified as available for redistribution, late qualifying applicants from that country may appear; if this occurs, the supply of unused visa numbers for redistribution will be correspondingly reduced. These late applicants, who may have encountered delays in gathering their visa paperwork, shall be eligible to participate in the recapture program until all recaptured visa numbers are exhausted.

Within each national group, recaptured visa numbers shall be made available to visa applicants in the chronological order in which they qualify. The processing of applications should not cease until all recaptured visa numbers are reissued or all plaintiff class members have been processed.

The district court shall require the entire recapture program to be completed within two years of the entry of the order on remand. This timetable may not be altered unless deemed necessary by the parties or upon a compelling showing that the interests of justice so require or that subsequent circumstances impose an unduly heavy burden on the defendants so as to justify a short extension of time to complete the processing. The district court may exercise

numbers for the first three fiscal years to natives of these countries as follows: Mexico, 1,350; Canada, 450; Brazil, 300; Venezuela, 300; Peru, 300; Bolivia, 300. Further assume that natives of these countries received recaptured visa numbers pursuant to the unauthorized distribution plans as follows: Mexico, 1,200; Canada, 450; Brazil, 200; Venezuela, 100; Peru, 50; Bolivia, 0. Of the visa numbers from Cubans whose status was adjusted in the first fiscal year, natives of these countries should receive the remaining visa numbers as follows: Mexico, 0; Canada, 0; Brazil, 0; Venezuela, 0; Peru, 50; Bolivia, 100. Of those recaptured from the second fiscal year: Mexico, 0; Canada, 0; Brazil, 0; Venezuela, 100; Peru, 100; Bolivia, 100. Of those recaptured from the third fiscal year: Mexico, 150; Canada, 0; Brazil, 100; Venezuela, 100; Peru, 100; Bolivia, 100.

19. The portion of the opinion dealing with the second modification was revised on rehearing.

20. Qualified visa demand, as used here, means demand by applicants who have taken the steps necessary for their final visa interviews.

its discretion, when necessary, to effect this court's order by adopting procedures reasonably calculated to facilitate the recapture program.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion. The district court is directed to give this case the highest priority and to expedite both the proceedings before it and the actual process of reissuing the recaptured visa numbers. Our mandate shall issue forthwith.

Reversed and Remanded.