Valentin CHAVEZ–RIVAS, Petitioner,

v.

Keith OLSEN, Warden; John Ashcroft, Attorney General; Director, Immigration and Naturalization Service, Respondents.

Civil Action No. 01–1018.

United States District Court, D. New Jersey.

July 8, 2002.

Richard Coughlin, Esq., Federal Public Defender, Camden, NJ, for Petitioner, Valentin Chavez–Rivas.

Christopher J. Christie, Esq., United States Attorney, Louis J. Bizzarri, Esq., Assistant United States Attorney, Camden, NJ, Robert D. McCallum, Jr., Esq., Assistant Attorney General, Mark C. Walters, Esq., Assistant Director, Stephen J. Flynn, Esq., Washington, DC, for Respondents, Keith Olsen, John Ashcroft, and Director, Immigration and Naturalization Service.

## OPINION

ORLOFSKY, District Judge.

### I. Introduction

In this case, I must decide whether the INS has the authority to detain indefinitely certain non-resident aliens, including the so-called "Mariel Cubans," and whether the procedures used in this case to detain the petitioner, Valentin Chavez–Rivas, violated the Due Process Clause.

With compromise comes hard choices. Two decades ago, in 1980, the United States made the decision as a nation to allow over 100,000 refugees to emigrate from Cuba to our shores.[1] We tempered

---

**1.** For a brief history of these "Mariel" Cubans, so called because of their port of departure from Cuba, *see* T. Alexander Aleinikoff, *Detaining Plenary Power: The Meaning and*

our welcome, however, by treating these Cuban immigrants as though they were still in the perpetual legal limbo of an immigrant just outside our territorial borders, with all the limitations on personal rights and liberties that derive from that status. *See, e.g., Rosales–Garcia v. Holland,* 238 F.3d 704, 731 n. 7 (6th Cir.2001) (Rice, J., dissenting) (describing admission of Cuban immigrants as "compassionate compromise" that saved lives but weakened some legal rights), *vacated and remanded for reconsideration sub nom. Thoms v. Rosales–Garcia,* — U.S. —, 122 S.Ct. 662, 151 L.Ed.2d 577 (2001); *Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1443, 1447–50 (9th Cir.1995) (holding that status granted to Cuban migrants after extensive deliberations by Congress did not entitle Cubans to Due Process under the Fifth Amendment), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995). Last year, the Supreme Court also struck a compromise of sorts, with Congress, limiting the scope of a federal statute authorizing detention of aliens who had been ordered removed without deciding the constitutionality of the statute. *See Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

As a result of these two decisions, one by Congress, and one more recently, by the Supreme Court, I now must decide to what extent the Court, in curtailing the immigration statute to protect the rights of aliens who have in fact arrived in this country, also intended to give the same protection to the thousands of Cuban immigrants who, although physically present in the United States, are still absent in the eyes of the law. A number of other courts have already considered whether the Supreme Court's decision in *Zadvydas* altered the constitutional landscape for Cuban detainees. *See Hoyte–Mesa v.*

*Ashcroft,* 272 F.3d 989 (7th Cir.2001); *Sierra v. INS,* 258 F.3d 1213 (10th Cir.2001); *Hernandez Nodarse v. United States,* 166 F.Supp.2d 538, 544–45 (S.D.Tex.2001). That is an easy question, however, because *Zadvydas* made clear that it, in fact, made no constitutional rulings at all. Only one other federal Court, however, has considered in a reported decision the more difficult question whether *Zadvydas's* statutory holding applies equally to all aliens. *See Borrero v. Aljets,* 178 F.Supp.2d 1034 (D.Minn.2001).

For the reasons that follow, I conclude that it does not. I determine that the INS retains the legal authority to detain Cubans and other aliens who are not, in a legal sense, present in the United States. I also conclude, however, that the INS violated the petitioner's Due Process rights in this case by relying in part upon evidence of arrests for previous offenses, without any evidence that the petitioner in fact committed those crimes, in concluding that he is a danger to the community. Accordingly, I shall direct the INS to conduct a new parole hearing free of the taint of that factor. In all other respects, I shall deny the relief sought by the Petitioner.

## II. Facts and Procedural History

Valentin Chavez–Rivas ("Chavez–Rivas") arrived in the United States from Cuba in May of 1980. He was taken into INS custody, but soon thereafter "paroled." That is, although in a technical legal sense still within the custody of the INS, he was given liberty to roam the country. *See* 8 U.S.C. § 1182(d)(5) (1976) (current version at 8 U.S.C. § 1182(d)(5)(A) (2000)); *Moret v. Karn,* 746 F.2d 989, 990 (3d Cir.1984). Following a 1989 conviction for trafficking in cocaine,

Chavez–Rivas's parole was revoked and he was returned to INS custody. He was paroled once more, in 1993, but in 1994 and 1995, he was again convicted of drug-related charges. At the conclusion of the service of his state court sentences for these charges, on March 6, 1998, he again returned to the custody of the INS, where he has remained since.

The INS periodically reviews Chavez–Rivas's continuing detention pursuant to the terms of its Cuban Review Plan, 8 C.F.R. § 212.12 (2001) ("The Plan"). The Plan provides that each detainee will be evaluated by a Cuban Review Panel, comprised of two members of the INS professional staff.[2] *See id.* § 212.12(d)(1). In order to recommend that a particular detainee be paroled, the panel members must conclude that he or she is presently non-violent, is likely to remain non-violent, and is not otherwise likely to violate any parole conditions in the event of his or her release. *Id.* § 212.12(d)(2). The Plan also provides a list of seven, apparently non-exclusive factors to guide the Panel in reaching its determinations. *Id.* § 212.12(d)(3). If the Panel cannot recommend parole based solely on the detainee's paper record, the Panel must interview the detainee. *Id.* § 212.12(d)(4)(ii). Although the detainee may be "accompanied" by a person of his choice at the interview, he has no right to counsel provided by the government, and no apparent right to review his record, cross-examine government witnesses, or call witnesses on his own behalf. *See id.* The interview, in short, is not an adversarial proceeding.

A Cuban Review Panel interviewed Chavez–Rivas in 1999, 2000, and, according to counsel at oral argument, in 2001. He was denied parole each time. (Tr. at 14.) In 1999 and 2000, the Panel's written explanation for each denial of parole relied in part on the fact that Chavez–Rivas had been arrested on a number of charges that were later dismissed, or for which no disposition was known. The record before me contains no explanation for the Panel's denial of parole in 2001 or 2002. Chavez–Rivas remains in INS custody.

On March 1, 2001, Chavez–Rivas filed this petition, pursuant to 28 U.S.C. § 2241 (2000). In June of 2001, the Supreme Court decided *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). I appointed counsel to represent Chavez–Rivas on August 7, 2001, and a day later, on August 8, 2001, the INS transferred him from New Jersey to another detention center in Louisiana. The Government then moved to dismiss the petition for lack of personal jurisdiction. I denied that motion, finding that Chavez–Rivas had properly named the Attorney General of the United States as a respondent, and that this Court has personal jurisdiction over the Attorney General as an officer of the United States. *See Chavez–Rivas v. Olsen,* 194 F.Supp.2d 368 (D.N.J.2002).

My earlier opinion also directed the parties to brief three questions related to the underlying merits of the petition. *See id.* at 377. Specifically, I asked both sides to consider whether the Cuban Review Plan is constitutional in light of *Zadvydas,* whether I should construe the INS's regulations in order to avoid any possible constitutional question, and, finally, whether Chavez–Rivas's Review Panels had violated the Due Process Clause by relying on arrests alone, rather than evidence of criminal conduct, in assessing his future

---

**2.** By "professional staff" I mean that the Panel is not comprised of Administrative Law Judges.

dangerousness. *Id.* I did not, however, prohibit the parties from briefing any other issues they deemed relevant, and Chavez–Rivas exercised this prerogative to argue, in addition, that the INS lacks the statutory authority to detain him under the Cuban Review Plan.

I have jurisdiction over this petition pursuant to 28 U.S.C. § 2241. *See Zadvydas,* 533 U.S. at 687–88, 121 S.Ct. 2491.

## III. Discussion

### A. Whether the Cuban Review Plan is Constitutional

The Third Circuit has already upheld the constitutionality of the indefinite detention of aliens having the same legal status as Chavez–Rivas. *See Ngo v. INS,* 192 F.3d 390, 398 (3d Cir.1999). Like Ngo, Chavez–Rivas is what the most recent incarnation of the Immigration & Naturalization Act ("INA") describes as an "inadmissible alien," and what was formerly known as an "excludable alien."[3] In other words, he has never gained legal entry into this country, notwithstanding his actual physical presence here. *See Zadvydas,* 533 U.S. at 693, 121 S.Ct. 2491 (citing *Leng May Ma v. Barber,* 357 U.S. 185, 188–90, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 213, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Kaplan v. Tod,* 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925)).

■ Chavez–Rivas argues, however, that *Zadvydas* has so undermined the Third Circuit's opinion in *Ngo* that I am free to disregard it. I disagree. The Supreme Court, technically, made no constitutional holding at all in *Zadvydas.* Rather, it determined that in light of the

potential constitutional problem that would arise were it to read the INA to authorize indefinite detention of certain aliens, it would instead read the statute as not, in fact, providing such authorization. *See Zadvydas,* 533 U.S. at 689–90, 121 S.Ct. 2491; *see also id.* at 694, 121 S.Ct. 2491 ("[W]e need not consider the aliens' claim that subsequent developments have undermined *Mezei's* legal authority."). While some might say that for practical purposes there is little to separate a constitutional holding from a holding based on a statutory interpretation that avoids the constitutional question, in this case, that distinction makes all the difference. The Third Circuit has made a constitutional determination, and the Supreme Court has not contradicted that holding. *Cf. Gilmour v. Rogerson,* 117 F.3d 368, 370, 372 (8th Cir.1997) (holding that Supreme Court's interpretation of federal statute to avoid constitutional question does not require lower federal court to find similar state statute unconstitutional), *cert. denied,* 522 U.S. 1122, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998). While it might be arguable that *Zadvydas* predicted or portends a future holding on the constitutional merits, " 'it is not for this Court to overstep a controlling precedent or to predict its eventual demise in the Supreme Court.' " *Bostic v. AT & T of the Virgin Islands,* 166 F.Supp.2d 350, 362 (D.V.I. 2001) (Orlofsky, J., by designation) (quoting *United States v. DeJesus,* 150 F.Supp.2d 684, 689–91 (D.N.J.2001) (Simandle, J.)). I therefore need not decide whether *Zadvydas* in fact offers any constitutional judgment at all with respect to inadmissible aliens. *See Hoyte–Mesa v. Ashcroft,* 272 F.3d 989, 991 (7th Cir.2001) (per curiam) (ruling that *Zadvydas* did

---

**3.** In contrast, I refer to aliens whom the law recognizes as having entered the country, but who now must depart, as "deportable."

not abrogate pre-existing Circuit precedent upholding constitutionality of indefinite detention of inadmissible, rather than deportable, alien).

■ Therefore, I am not free to find the Cuban Review Plan unconstitutional as applied to Chavez–Rivas. Under any fair reading of *Ngo*, it is not. *See Ngo*, 192 F.3d at 399 (pointing to Cuban Review Plan as example of regulations that would pass constitutional muster).[4]

### B. Whether I Must Read the Cuban Review Plan or its Underlying Statute to Avoid a Constitutional Question

My determination that detention under the Cuban Review Plan is constitutional largely disposes of the constitutional avoidance argument, as well. If the purpose of the avoidance doctrine is to forestall judicial resolution of constitutional questions, *see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), it should have little utility once a question has already been raised and answered. Thus, while the Supreme Court has hardly been generous in providing guidance to the federal courts in deciding when a constitutional question is so "serious" as to merit avoidance, *id.*, common sense suggests that a question already recently settled need no longer be avoided, even if it remains somewhat controversial. *See Ma v. Ashcroft*, 257 F.3d

1095, 1107 (9th Cir.2001). The avoidance canon also rests on a presumption that the coordinate branches of government do not "intend" to violate the Constitution. *See DeBartolo*, 485 U.S. at 575, 108 S.Ct. 1392. From a positivist standpoint, once a court has found a statute constitutional, there is no longer any danger that identical governmental action will violate the Constitution, although there might well be competing, and potentially authoritative, interpretations of the Constitution available.

Under either analysis, there is no basis, in light of *Ngo*, for reading either the Cuban Review Plan or its authorizing statutes to avoid any potential constitutional problem. I must therefore reject this claim as well.

### C. Whether the INS has Statutory Authority to Detain an Alien Indefinitely under the Cuban Review Plan

■ I now come, therefore, to the true crux of this petition. I also approach, curiously, the limits of most extant reported judicial opinion. The federal courts have thus far largely been content to assure themselves that the holding of *Zadvydas* does not render continued detention of inadmissible aliens unconstitutional. Only one court, however, appears to have considered whether or not *Zadvydas*, which after all is an exercise in statutory interpretation, undermines the INS's statutory authority to detain an alien. *See Borrero*

---

4. There might be an argument that the INA itself is unconstitutional to the extent that it authorizes detention of any inadmissible alien, regardless of whether or not the alien is a danger to the community or a flight risk. While *Ngo* upheld the constitutionality of detention, it did so only on the condition that detained aliens were given regular parole hearings to assess their dangerousness and risk of flight. *See Ngo*, 192 F.3d at 398–99. The necessary implication is that alien status alone is insufficient to justify detention. *See id.* at 398 (holding that the "process due even to excludable aliens requires an opportunity for an evaluation of the individual's current threat to the community and his risk of flight"). Chavez–Rivas does not claim, however, that the Cuban Review Plan under which he is detained permits detention of aliens who are not likely to flee or cause harm.

*v. Aljets,* 178 F.Supp.2d 1034, 1041–42 (D.Minn.2001). That is a question, as the following discussion demonstrates, of some subtlety.

According to Chavez–Rivas, the post-removal detention statute, 8 U.S.C. § 1231 (2000), as interpreted by the Supreme Court in *Zadvydas,* limits the INS's authority to detain both deportable and inadmissible aliens. Echoing Justice Kennedy's dissent in *Zadvydas,* Chavez–Rivas argues that the language of the statute cannot reasonably support different outcomes for the two different groups. Therefore, if the text limits post-removal detention to six months for deportable aliens, it must also limit post-removal detention to six months for inadmissible aliens. The INS responds both by disputing this syllogism and also by arguing that 8 U.S.C. § 1231 does not apply to Chavez–Rivas at all. I will first address the question of which statute applies.

### 1. The Applicable Statute

The INS contends that its power to detain Chavez–Rivas is not affected by the Supreme Court's interpretation of § 1231, because § 1231 does not apply to him. Section 1231 was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, Div. C, 110 Stat. 3009–546 (codified as amended in scattered sections of 8 U.S.C.) ("IIRIRA"). Although IIRIRA had a general effective date of April 1, 1997, *see* IIRIRA § 309(a) (codified at 8 U.S.C. § 1101 note (2000)), certain provisions did not apply "in the case of an alien who is in exclusion or deportation proceed-

ings as of the ... effective date." *Id.* § 309(c)(1). According to the INS, Chavez–Rivas falls within this exception.

■ As an initial matter, I note that I owe the INS's view of the statute's temporal scope little deference. As an informal opinion expressed only in court briefs, the INS's interpretation is not entitled to *Chevron* deference. *See Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Thus, it is entitled to deference in accordance with the " 'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). The INS's interpretation, I am sad to report, appears to be no more than an ad hoc judgment offered for no greater purpose or policy than that it is advantageous to advance the INS's position in this particular litigation. The INS has taken a directly contrary position in two other reported decisions. *See Sierra v. INS,* 258 F.3d 1213, 1216 n. 2 (10th Cir.2001); *Zadvydas v. Underdown,* 185 F.3d 279, 286 (5th Cir.1999), *rev'd sub nom. Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).[5] At oral argument, counsel for the Respondents claimed that the INS's position in *Zadvydas* applied only to *deportable* crimi-

---

**5.** There is also a plausible, albeit weak, argument that the INS is barred by the doctrine of judicial estoppel from taking a position contrary to that successfully pressed in previous litigation to gain unfair advantage in the present suit. *See New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001); *Scarano v. Central R. Co.,* 203

F.2d 510, 513 (3d Cir.1953). Other forms of estoppel are not favored against governmental entities, *see Heckler v. Cmty. Health Servs. of Crawford County,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), and the government's clear interest in changing its policies to adapt to changing needs weighs heavily against tying its hands. Still, where

nal aliens. (Tr. at 19.) I fail to see the relevance of that distinction here, and, in any event, the INS has nothing at all to distinguish its position in *Sierra,* wherein the petitioner was, like Chavez–Rivas, inadmissible. Nor is there any evidence that the INS's conclusion is based on underlying policy concerns, or indeed, on reasoned deliberation of any kind. Accordingly, I will not defer to its interpretation of IIRIRA § 309 in this case. *Cf. Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.")

Even if the INS's interpretation were entitled to full deference under *Chevron,* I would reject its view as inconsistent with the plain meaning of the statute. The text of IIRIRA § 309(c) excepts an alien who "is in exclusion or deportation proceedings as of" the statutory effective date. In other words, the exception applies if, as of April 1, 1997, there are ongoing proceedings. *See Zadvydas,* 185 F.3d at 286. Other courts have apparently read the "as of" language to mean that the exception applies to any alien whose proceedings had begun by the time of the effective date, regardless of whether they then terminated before that time. *See Sierra,* 258 F.3d at 1216 n. 2; *Carrera–Valdez v. Perryman,* 211 F.3d 1046, 1048 (7th Cir.2000). But that reading transforms "is in" to "has been in" or "has begun." [6] To the extent that there is ambiguity between these pos-sibilities, I must resolve such doubts in favor of the alien. *See INS v. St. Cyr,* 533 U.S. 289, 320, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *see also Landgraf v. USI Film Prods.,* 511 U.S. 244, 276 n. 30, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (noting common law presumption that "government should accord grace to private parties disadvantaged by an old rule when it adopts a new and more generous one").

Finally, even if I were to agree that Chavez–Rivas was "in exclusion or deportation proceedings" as of April 1, 1997, I would still conclude that the detention provisions of § 1231 apply to him. IIRIRA " § 309(c)(1) is best read as merely setting out the *procedural* rules to be applied to removal proceedings pending on the effective date of the statute." *St. Cyr,* 533 U.S. at 318, 121 S.Ct. 2271 (citing H.R. Conf. Rep. No. 104–828, p. 222 (1996)). Whatever may be the exact boundary of "procedure," it certainly cannot plausibly include statutory provisions authorizing imprisonment. *Cf. Landgraf,* 511 U.S. at 275, 114 S.Ct. 1483 (describing "procedural" statutes as those regulating secondary, rather than primary, conduct). Therefore, I conclude that § 1231 does apply to Chavez–Rivas.

**2. Whether Zadvydas Controls the Meaning of § 1231 as Applied to Inadmissible Aliens**

Chavez–Rivas argues that, under the Supreme Court's narrowing interpretation

---

the government's change in position appears not to reflect any underlying change in policy or ideology, but rather may be advanced to gain an advantage in litigation, the argument for judicial estoppel seems strongest. Because I ultimately reject the INS's position on the merits, I need not decide whether the doctrine of judicial estoppel should be applied in this case.

6. One might also argue, although the INS seemingly does not, that because post-removal detention is ancillary to the removal itself, it is part of the same proceeding. That reading, however, fails to give effect to the statutory terms "exclusion or deportation hearings," IIRIRA § 309(c)(1), which identify two out of many possible proceedings amended by IIRIRA.

of § 1231, aliens of any stripe may not be detained beyond a period reasonably necessary to secure their removal. In his view, once the Supreme Court has interpreted a statute to avoid a constitutional question, the Court's interpretation remains authoritative even in circumstances that would not present any constitutional difficulty. At oral argument Chavez–Rivas also suggested another approach with the same result: although in some circumstances lower courts may be free to follow the broadest meaning of a statute narrowed by the Supreme Court, the language of § 1231 in particular cannot support differing meanings in different contexts.[7] (Tr. at 5, 20.)

In my view the second contention is plausible, but the first is not. A universal rule that a Supreme Court interpretation avoiding serious constitutional questions applies to every conceivable application of the statute would dramatically expand the power of the courts at the expense of Congress. The avoidance canon "should not be given too broad a scope lest a whole new range of Government action be proscribed by interpretive shadows cast by constitutional provisions that might or might not invalidate it." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 481, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (Kennedy, J., dissenting). Indeed, in one sense the avoidance canon is only a corollary to the doctrine of severability—that is, the principle that courts should minimize the extent to which they displace legislative will based upon constitutional

imperatives. *See Crowell v. Benson*, 285 U.S. 22, 62–63, 52 S.Ct. 285, 76 L.Ed. 598 (1932). If Congress has directed that its statute should not stand or fall as a whole, courts should similarly impose second-best readings designed to avoid constitutional problems only as to those portions of the statute that present constitutional difficulties.[8]

The cases cited by Chavez–Rivas are not to the contrary. In *Chmakov v. Blackman*, 266 F.3d 210, 214–15 (3d Cir.2001), the Third Circuit confronted the question whether the Supreme Court's determination in *St. Cyr* that IIRIRA did not revoke federal habeas jurisdiction for aliens with no other avenue of review applied equally to aliens who had other review available. The court first noted that *St. Cyr* rested not only on constitutional avoidance principles but also on the common law interpretive canon "requiring a clear statement of congressional intent to repeal habeas jurisdiction." *Id.* at 213 (internal quotations omitted). Thus, although it admitted that there was no constitutional problem in denying habeas jurisdiction for Chmakov, the court concluded that jurisdiction would still exist in the absence of a clear statutory statement to the contrary. *Id.* at 214. It appears, therefore, that *Chmakov* was based, not on the view of the avoidance canon that Chavez–Rivas argues, but rather on the common-law notion that statutes repealing jurisdiction are not favored.

Nor does some of the broad-sweeping language of *Chmakov* point to a contrary

---

**7.** The INS has opined that *Zadvydas* does not apply to inadmissible aliens. *See* Continued Detention of Aliens Subject to Final Orders of Removal, 66 FR 56967, 56968 (Nov. 14, 2001) (interim rule). I very much doubt that a court must accord *Chevron* deference to agency interpretations of caselaw affecting statutes within the agency's purview. That, after all, would tread very close to the exclusive Article III power to "say what the law is." *Marbury*

*v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Because, however, I ultimately agree with the INS's position, I need not decide how much deference, if any, to accord its position.

**8.** IIRIRA's severability clause can be found at Pub.L. 104–208, Div. C § 1(e) (codified at 8 U.S.C. § 1101 note).

conclusion. The *Chmakov* court remarked that:

> The Supreme Court has held that those provisions [putatively withdrawing jurisdiction] have a particular meaning, and that meaning does not indicate a congressional intent to repeal habeas jurisdiction. It simply cannot be that the meaning will change depending on the background or pedigree of the petitioner. Were we to so hold, we would render the meaning of any statute as changeable as the currents of the sea, and potentially as cruel and capricious.

*Id.* at 215. This language, however, is part of the court's analysis of whether or not IIRIRA "clearly" withdraws habeas jurisdiction. The INS had claimed that the very language in IIRIRA that the Supreme Court found insufficiently clear in *St. Cyr* could nonetheless be clear enough to withdraw habeas jurisdiction for Chmakov. *See id.* The *Chmakov* court, in rejecting that argument, simply concluded that what the Supreme Court had already found unclear could not magically become clear. The reference to the "background or pedigree of the petitioner" likely is meant only to emphasize the fact that the standard for statutory clarity is the same regardless of whether the clear statement rule is supplied by the avoidance canon or by commonlaw principles.[9]

Finally, Chavez–Rivas claims that the D.C. Circuit categorically treats Supreme Court narrowing interpretations as authoritative regardless of whether there is constitutional doubt in the subsequent case. The cases he relies upon, however, do not support that proposition, nor do any others that I have been able to locate independently. *See Sofamor Danek Group, Inc. v. Gaus*, 61 F.3d 929, 936 n. 36 (D.C.Cir.1995) (citing *Food Chemical News v. Young*, 900 F.2d 328, 332–33 (D.C.Cir.1990)), *cert. denied*, 516 U.S. 1112, 116 S.Ct. 910, 133 L.Ed.2d 841 (1996). *Food Chemical News*, for example, never even mentions the avoidance canon. Instead, it seems to conclude that the Supreme Court would have reached the same result based on ordinary principles of statutory interpretation, such that the existence or not of a constitutional issue in later cases would not matter. *See Food Chemical News*, 900 F.2d at 332–33. Thus, when the D.C. Circuit subsequently relied on *Food Chemical News* to apply the Supreme Court's narrow definition, it had no occasion to decide whether the Supreme Court's avoidance rationale required that interpretation. *See Sofamor Danek*, 61 F.3d at 936 & n. 36.

I therefore cannot agree that a Supreme Court interpretation based on the avoidance canon necessarily binds all subsequent interpretations of the statute. I agree with Chavez–Rivas, however, that the language of a statute will sometimes not bear two different readings for two different sets of facts. If IIRIRA were to have provided, for example, that "because

---

**9.** My understanding of interpretive theory also leads me to conclude that the *Chmakov* court intended to address only the question of whether IIRIRA was "clear." As I discuss, *infra*, there are many statutory and constitutional contexts where the meaning of one set of words does, in fact, "change depending on the background or pedigree" of the parties. That is because a court makes atextual presumptions about, or, more accurately, imputes, Congressional or the Founders' intentions, based on constitutional principles or historical understanding. The *St. Cyr* clear statement rule, however, eliminates or dramatically narrows judicial assumptions by demanding that intent flow from the text alone. *See Chmakov*, 266 F.3d at 214. Unless a text itself makes distinctions between two classes, a statute does not "clearly" make that distinction. *Chmakov's* pronouncements thus are perfectly consistent with a search for a clear statement, but rather imperfectly suited to general interpretation.

it is the intent of Congress that all aliens be treated identically for detention purposes, the Attorney General shall have the same authority to detain inadmissible aliens as he has to detain deportable aliens, no more, and no less," it would obviously be difficult to claim that *Zadvydas* did not also affect the rights of inadmissible aliens. *Cf. New York v. United States*, 505 U.S. 144, 186, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (noting that, although Court generally presumes that statutes are severable, Congress may direct otherwise); *Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality op.) (same). The remaining question, then, is whether the rather less clear language of IIRIRA has the same effect.

IIRIRA's detention provision makes no distinction between inadmissible aliens and several other types of deportable aliens, such as those who have overstayed their visas.[10] Justice Kennedy, in his *Zadvydas* dissent, seemed to argue that this silence was evidence that the statute could not permit different treatment of the respective classes of aliens, although beyond asserting that "[t]he text does not admit of this possibility" he does not explain his reasoning. *Zadvydas*, 533 U.S. at 710–11, 121 S.Ct. 2491 (Kennedy, J., dissenting); *see also Borrero*, 178 F.Supp.2d at 1041–42 (agreeing with Justice Kennedy's analysis). The majority does not explicitly disavow Justice Kennedy's claim on this point.

Respectfully, I believe Justice Kennedy's analysis is inconsistent with interpretive principles underlying not only the majority opinion in *Zadvydas* but also

much of modern law. As the Court has observed, interpretations under the avoidance canon are, effectively, little different than using context, or the legislative history of a statute, to narrow the scope of a broad textual provision. *See United States v. Witkovich*, 353 U.S. 194, 199, 77 S.Ct. 779, 1 L.Ed.2d 765 (1957). Courts commonly use context or legislative history to give language that itself makes no distinctions multiple meanings. For example, the legislative history of a statute can demonstrate that a seemingly universal term applies differently to different persons. *See, e.g., Holy Trinity Church v. United States*, 143 U.S. 457, 464–65, 12 S.Ct. 511, 36 L.Ed. 226 (1892) (using legislative history, among other factors, to determine that statutory term "labor or service of any kind" did not include clergymen). Similarly, courts read into broad terms distinctions based on underlying policy, *see, e.g.,* Kathleen M. Sullivan & Gerald Gunther, *Constitutional Law* 959–63, 966–68 (14th ed.2001) (summarizing various theories limiting scope of constitutional language, "Congress shall make no law … abridging the freedom of speech," and describing the different degrees of protection given to each different form of speech), or upon an interplay of history, constitutional principle, and policy, *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that term "person" in 42 U.S.C. § 1983 includes state officers in their official capacity only if the officers are sued for prospective injunctive relief). The *Zadvydas* court itself recognized that the term "person" in the Fifth Amendment has been applied, in

---

10. IIRIRA provides that:

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6) (2000).

effect, to cover only persons both legally and physically within our territorial borders. *See Zadvydas*, 533 U.S. at 693, 121 S.Ct. 2491 (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990); *Mezei*, 345 U.S. at 213, 215, 73 S.Ct. 625; *Johnson v. Eisentrager*, 339 U.S. 763, 784, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)).

To accept Justice Kennedy's view, then, we would have to conclude that "person" can bear two or more meanings, but "an alien ... may be detained beyond the removal period" cannot. 8 U.S.C. § 1231(a)(6). "Alien," a legal term of art, hardly seems less open to technical legal distinctions than "person." And the *Zadvydas* majority held that "may be detained" was sufficiently open textured to bear a limiting construction. *See Zadvydas*, 533 U.S. at 697, 121 S.Ct. 2491. I see nothing in the text of IIRIRA that would permit a limiting construction that says, in essence, "an alien may be detained for a period reasonably necessary to secure removal," but that would deny a limiting construction that says, in effect, "an alien may be detained beyond the removal period, and, if the alien is not inadmissible, such detention shall not extend beyond a period reasonably necessary to secure removal."

In short, although Justice Kennedy's dissenting remarks were not repudiated outright by the *Zadvydas* majority, the two are likely irreconcilable in principle. In any event, I read IIRIRA as capable of sustaining a reasonable interpretation that differentiates between inadmissible and

deportable aliens. In the absence of any binding authority to the contrary, I conclude that the better policy is to presume that Congress would have wanted to sever the plainly constitutional from the possibly unconstitutional aspects of the statute. *Cf. New York*, 505 U.S. at 186, 112 S.Ct. 2408 (noting that Court presumes Congress would want to sever constitutional from unconstitutional portions of statute). Therefore, I will not apply *Zadvydas's* statutory holding to inadmissible aliens.

**3. The Proper Construction of § 1231(a)(6)**

My conclusion that *Zadvydas* does not require the same result for both inadmissible and deportable aliens does not end my inquiry. I must also interpret the statute independently to determine whether, regardless of *Zadvydas*, it operates to limit the Attorney General's authority to detain and parole inadmissible aliens. If I find section that § 1231(a)(6) is ambiguous, I must to defer to any permissible, authoritative INS interpretation of it. *See INS v. Aguirre–Aguirre*, 526 U.S. 415, 424–25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). Since the Supreme Court has already determined that § 1231(a)(6) is ambiguous in the critical respect, *see Zadvydas*, 533 U.S. at 697–98, 121 S.Ct. 2491, I need only consider whether the INS's interpretation is a permissible reading of the statute.[11]

Although I may not agree with all of the policy considerations that informed the INS's reading of IIRIRA, I cannot say that they are so unreasonable as to render the INS's interpretation impermissible.

---

11. The INS has stated that "[t]he Attorney General is authorized to detain these aliens beyond the removal period consistent with section 241(a)(6) of the Act, 8 U.S.C. [§ ] 1231(a)(6)." Detention of Aliens Ordered Removed, 65 FR 80281, 80291 (Dec. 21, 2000) (to be codified at 8 CFR §§ 212, 236, 241) (final rule). Because it is the result of notice and comment rulemaking under the APA, and is an interpretation of a statute committed to the care of the INS, the INS's opinion on this point is entitled to full *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Aguirre–Aguirre*, 526 U.S. at 424–25, 119 S.Ct. 1439.

For example, the INS argues that continued detention of certain aliens is a necessary component of our foreign policy. Without continuing detention, the INS claims, overseas dictators would use the United States as a dumping ground for their criminals and malcontents. I frankly fail to see how the fact that the United States will detain these exiles would in any way deter a despot from ejecting them. Tyrants, I suspect, are rarely moved by empathy for their oppressed subjects. *See Barrera–Echavarria,* 44 F.3d at 1452 (Pregerson, J., dissenting) (arguing that "Fidel Castro simply could care less whether we imprison or set free [his] former imprisoned citizens"). In fact, the policy is positively perverse, because it provides the dictator with the assurance that an unwanted agitator will not be at liberty to sneak back into his homeland. Still, it is the Executive's prerogative to conduct foreign policy relatively unfettered by second-guessing by federal judges. *See Zadvydas,* 533 U.S. at 700, 121 S.Ct. 2491 (citing *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 196, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983)). While I think the INS's policy will not have the beneficial effects the INS hopes for, I cannot say it is unreasonable. Thus, given IIRIRA's textual ambiguity, *see Zadvydas,* 533 U.S. at 697, 121 S.Ct. 2491, I must sustain the INS's interpretation of the statute.

I conclude, therefore, that under the INS's permissible reading of § 1231(a)(6), to which I defer, IIRIRA does not limit the period or purpose for which an inadmissible alien may be detained. Accordingly, I must deny Chavez–Rivas's petition to the extent that it argues otherwise.

### D. Whether the Cuban Review Panel Violated Chavez–Rivas's Right to Due Process

■ Chavez–Rivas also argues that the procedural protections afforded him by the Cuban Review Panels failed the Fifth Amendment test of Due Process. Chavez–Rivas's complaints, at this point, appear to be primarily "facial"; that is, he claims that the procedures are categorically insufficient to protect his rights. He argues, for example, that the government does not provide him with counsel at its own expense; that he can be detained based upon a standard of proof that is ill-defined and in any event low; and that decisions are made by inexpert and potentially biased members of the INS staff, rather than by administrative law judges.

Chavez–Rivas's arguments have real force, and any conscientious nation, which loves liberty as ours does, must consider them seriously. The right to counsel is a fundamental protection not only in our criminal justice system, but also in many other civil detention schemes. *See* 18 U.S.C. § 3142(f) (2000) (providing counsel for bail hearings); 18 U.S.C. § 4247(d) (2000) (providing counsel for civil commitment hearings); *Kansas v. Hendricks,* 521 U.S. 346, 364, 368–69, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (identifying appointment of counsel as one of "strict procedural safeguards" that make civil commitment statute constitutionally permissible); *United States v. Salerno,* 481 U.S. 739, 751–52, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (pointing to appointment of counsel as one of the "extensive safeguards" that made Bail Reform Act constitutional); *Vitek v. Jones,* 445 U.S. 480, 496–97, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (plurality op.) (arguing that procedural due process requires appointed counsel for inmate who will be committed to mental hospital); *id.* at 499–500, 100 S.Ct. 1254 (Powell, J., concurring) (providing fifth vote, and arguing that due process requires that state provide inmate with "competent, ... qualified and independent assistance"); *United States v. Budell,* 187 F.3d 1137, 1141 (9th

Cir.1999) ("It is clear that at a civil commitment hearing an insanity acquittee is constitutionally entitled to counsel." (citing *United States v. Baker*, 45 F.3d 837, 842–43 (4th Cir.1995))). *But cf. Gagnon v. Scarpelli*, 411 U.S. 778, 787–88, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (holding that parolees have no right to appointed counsel at revocation hearing, because such hearings are "predictive and discretionary" rather than adversarial). Similarly, the Supreme Court's confidence in the impartiality and expertise of parole boards appears to have been a central feature of its determination that the full safeguards of a criminal trial are not necessary at parole hearings. *See Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

I read the Third Circuit's opinion in *Ngo*, however, as largely foreclosing Chavez–Rivas's facial challenge on these grounds. Although the Third Circuit seemed a bit uncertain whether it was considering a substantive or procedural due process challenge, it nonetheless determined that the Cuban Review Plan met the requirements of the Due Process Clause. *See Ngo*, 192 F.3d at 399. All of the objectionable features of the Plan challenged now by Chavez–Rivas were then present (with one exception, *infra*), and very likely known to the *Ngo* court, in 1999. *See id.* (reciting features of interim rule at issue, and comparing them to the rules for detaining Mariel Cubans). It is worth noting, though, that whether or not such protections are constitutionally compelled, they deserve serious consideration from the political branches. Appointed counsel, and administrative law judge involvement,[12] would do much to shield our system of detention from the real possibility of arbitrariness, as well as from accusa-

tions of such, whether fair or unfair, that already have been directed at it from many corners.

One aspect of the Cuban Review Panel's determination that appears to have been left open by the *Ngo* court was the Panel's use of past arrests, without evidence that Chavez–Rivas committed the underlying crime charged, to determine Chavez–Rivas's future dangerousness. *See* Ans. Exhs. 8, 9 ("You have demonstrated a propensity to engage in aggravated criminal behavior as reflected by your criminal record, which reflects arrests for lewd and lascivious act/behavior, aggravated battery and rape. Also, your record reveals arrests for [numerous other offenses]."); *see also id.* (attaching criminal history indicating that many of the referenced charges were dismissed or reflect "no disposition").

In response to my request for supplemental briefing on this issue, the INS argues that Chavez–Rivas, as an inadmissible alien, is entitled to only so much due process as the Government chooses to afford him. That argument is plainly wrong, at least in this Circuit. "Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process." *Ngo*, 192 F.3d at 396 (citing *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896)). While the INS is free to disagree with the Third Circuit's view, I am not. As the INS conceded at oral argument, *Ngo's* constitutional holdings were not abrogated by *Zadvydas*. (Tr. at 27.) *Ngo* held that detention of inadmissible aliens does not violate the aliens' substantive due process rights so long as the detention is contingent on "an evaluation of the individual's current threat to the community and his risk of flight." *Ngo*, 192 F.3d at 398. While that is a bit of a

---

12. I note that, unlike the INS professional staff, immigration judges regularly decide bail

petitions and other issues involving the current and future dangerousness of aliens.

legal Frankenstein's Monster—a substantive right to process—it is logical in the sense that the extent of the deprivation of the alien's liberty is limited by the requirement of highly focused and regular hearings. The implication is that the balance between liberty and governmental interest would tip towards freedom if liberty were more curtailed, or the government's interests more diffuse. *See Patel v. Zemski*, 275 F.3d 299, 309–10 (3d Cir.2001). Furthermore, it is possible that we could reach essentially the same result through a procedural due process analysis. *See Zadvydas*, 533 U.S. at 721, 121 S.Ct. 2491 (Kennedy, J., dissenting) ("[B]oth removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious.")

In my view continued detention based on the fact that an alien had been arrested, without any proof that an alien in fact committed the underlying offense, would be no better than the "grudging and perfunctory" review condemned in *Ngo* as inadequate to satisfy substantive due process. 192 F.3d at 398–99. To be clear, the problem is not that the INS has failed to prove the underlying conduct by less than proof beyond a reasonable doubt. There is little question that incarceration can be extended based upon less convincing evidence of relevant conduct. *See United States v. Watts*, 519 U.S. 148, 155–56, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). The problem is that the INS offered *no* evidence of the underlying conduct, in effect relying upon the fact of arrest alone, without more. The Third Circuit has previously left open a similar question in the context of civil confinement of citizens. *See Griffin v. Vaughn*, 112 F.3d 703, 708–09 (3d Cir.1997).

In other civil detention contexts, the Supreme Court has repeatedly emphasized that detention can be justified based not on allegations, but only upon proof (to varying degrees of certainty) of facts supporting a finding of dangerousness. For example, in *Salerno*, the court found that one of the major factors in favor of the constitutionality of the federal bail statute was that "the Act [is not] by any means a scattershot attempt to incapacitate those who are merely suspected of . . . serious crimes." 481 U.S. at 750, 107 S.Ct. 2095. Instead, bail can only be denied where "the Government musters convincing proof." *Id.* Moreover, the Court emphasized that "the numerous procedural safeguards detailed . . . must attend this adversary hearing." *Id.* at 755, 107 S.Ct. 2095. Thus, if the Government did not ultimately have the burden of proffering actual evidence of dangerousness based on more than mere suspicions, detention would likely be unconstitutional.

The rather opaque decision in *Carlson v. Landon*, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952) is probably to the same effect. There, the Court held that the Attorney General did not abuse his discretion, or violate the Due Process clause, by denying bail to aliens who had been shown to be active members of the Communist Party. *Id.* at 540–41, 72 S.Ct. 525. The Court repeated several times, though, that "evidence of membership plus personal activity in supporting and extending" the Party was necessary to support detention. *Id.* at 541, 72 S.Ct. 525. Again, then, actual evidence of the risk factors justifying detention appears to have been a necessary component of due process.

The INS has also taken the position that use of unverified charges may be considered for detention purposes because "such conduct is sufficient to support a finding of removability." Detention of Aliens Ordered Removed, 65 FR 80281, 80288 (Dec. 21, 2000) (comment on final rule). That argument strikes me as a *non sequitur*; if the INS's claim is true, then other factors that may prompt deportation, such as

whether or not one has overstayed one's visa, *see* 8 U.S.C. § 1227(a)(1)(C), somehow also must predict whether or not one is dangerous. Yet that is plainly not the case; it would mean, in effect, that anyone who is deportable is a danger to the community. Alternately, the claim may be that the INS, or Congress, has plenary power to define what makes an alien detainable, much as Congress has plenary power to define what shall render an alien deportable. But the Third Circuit has rejected that view. What makes an alien deportable is a statutory standard established by Congress within its plenary power to control immigration. The constitutionality of the methods used to enforce that plenary power, however, is an entirely separate matter. *See Patel*, 275 F.3d at 308.

I conclude, therefore, that by relying in part upon unverified or uncorroborated charges to justify its decision, the INS detained Chavez–Rivas contrary to law. Therefore, I will order the INS to convene a new Cuban Review Panel, at the earliest time practicable, in order to evaluate whether Chavez–Rivas is entitled to parole without the consideration of uncorroborated or unproven criminal charges.

## IV. Conclusion

For the reasons set forth above, I shall grant the petition in part and deny it in part. The petition is granted to the extent that Chavez–Rivas seeks review by a new Cuban Review Panel, which will consider whether or not parole is warranted without reference to arrests or charges not substantiated by any other evidence. The petition is denied in all other respects. The Court will enter an appropriate form of Order.